UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
JENNIFER SACHS,

                Plaintiff,

    -against-                         **COMPLAINT**

WILLIAM CANTWELL, in his individual
capacity, JOSEPH MUSA, in his individual
capacity, ALEXANDRA PAQUETTE, in her
individual capacity, JOHN DOES #1-3, each in
his individual capacity, THE CITY OF NEW
YORK, AARON SAGENDORF, PATRICK
FORD, JOHN DOE #4, SMITH &
WOLLENSKY OPERATING CORPORATION,
and FOURTH WALL RESTAURANTS, LLC,

                Defendants.

Demand for Jury Trial
---------------------------------------------------------------X

      Plaintiff, Jennifer Sachs, by and through her attorneys LeBow & Associates, PLLC,

complains of the Defendants, and each of them, as follows:

## I. PRELIMINARY STATEMENT

      Plaintiff Jennifer Sachs brings this action under 42 USC §§1983 and 1988 and New York

State law to redress Defendants' violations of the rights and immunities secured to Plaintiff by

the United States Constitution and New York State law.  On March 3, 2009, when Plaintiff was

in the Wollensky's Grill restaurant ("WG Restaurant"), she was attacked by the WG Restaurant's

manager, Defendant Aaron Sagendorf ("Sagendorf"), and by another patron, Defendant John

Doe #4 ("Mike").  In the course of the attack and ensuing events, Sagendorf, Mike, and

Defendant Patrick Ford ("Ford"), the WG Restaurant's bartender, gave false information to New

York City Police Department ("NYPD") officers Defendants Cantwell, Musa, and John Does #1-

1

3 (the "Arresting Officers") that resulted in the Arresting Officers arresting Plaintiff, despite the fact that the Arresting Officers should have known that Plaintiff had clearly not committed a crime.  During the course of the arrest, Musa used force against Plaintiff far in excess of what was reasonably necessary to effectuate her arrest, and in the process caused her physical harm. Subsequent to Plaintiff's arrest, the Arresting Officers and NYPD officer Paquette maliciously prosecuted Plaintiff on false charges based on information from Sagendorf, Ford, and Mike, despite the fact that the Arresting Officers and Paquette should have known that Plaintiff had clearly not committed any of the charged crimes.  In the events described herein, the Arresting Officers and Paquette were acting under color of state law.  Plaintiff alleges that the Arresting Officers were responsible for her unlawful arrest and illegal detention, that the Arresting Officers and Paquette were responsible for her malicious prosecution on false charges, and that Musa was responsible for using excessive force against her, all in violation of her rights under the 4th and 14th Amendments to the United States Constitution.  Plaintiff further alleges that Sagendorf and Mike committed assault and battery against her in violation of New York State law, and that Sagendorf, Ford, and Mike were responsible for maliciously initiating her prosecution on false charges in violation of New York State law.  The WG Restaurant is owned by Defendant Smith & Wollensky Operating Corporation ("SW Operating") and managed by Defendant Fourth Wall Restaurants, LLC ("Fourth Wall").   Plaintiff brings her constitutional claims under 42 U.S.C. §1983, and her other claims under New York State law, and asserts separate theories of liability against the various Defendants as follows: (1) as against the Arresting Officers and Paquette, Plaintiff asserts claims based upon theories of individual liability and alleges factually that (A) each of the Arresting Officers was directly involved in her unlawful arrest and illegal detention in violation of her rights under the Fourth Amendment, Fourteenth Amendment, and New York

State law, (B) each of the Arresting Officers and Paquette were directly involved in her malicious prosecution in violation of her rights under the Fourth Amendment, Fourteenth Amendment, and New York State law, and (C) Musa was responsible for using excessive force against her in violation of her rights under the Fourth Amendment and New York State law; (2) as against the City of New York, Plaintiff asserts a claim based upon entity liability and alleges that Defendant City of New York maintained certain policies, customs and practices regarding the hiring, training, supervision and disciplining of police officers that demonstrated a deliberate indifference towards the constitutional rights of Plaintiff and others, and directly and proximately caused the violation of Plaintiff's 4th and 14th Amendment rights; (3) as against Sagendorf, Ford, and Mike, Plaintiff asserts that (A) Sagendorf and Mike committed assault and battery against her in violation of her rights under New York State law, and (B) Sagendorf, Ford, and Mike were responsible for her malicious prosecution in violation of her rights under New York State law; (4) as against SW Operating and Fourth Wall, Plaintiff asserts that (A) SW Operating and Fourth Wall were vicariously liable for Sagendorf's assault and battery of Plaintiff, which was committed within the scope of Sagendorf's employment, (B) SW Operating and Fourth Wall were vicariously liable for Sagendorf and Ford's malicious prosecution of Plaintiff, which was committed within the scope of Sagendorf and Ford's employment, and (C) SW Operating and Fourth Wall were liable to Plaintiff for negligent retention of Sagendorf as an employee when his violent tendencies should have been evident.  Plaintiff seeks compensatory damages against all Defendants and punitive damages against all Defendants except for the City of New York.

## II. JURISDICTION AND VENUE

1. This Court has federal question jurisdiction over the federal civil rights claims asserted herein against Defendants Cantwell, Musa, Does #1-3, Paquette, and the City of New York

pursuant to 28 U.S.C. §§1331 and 1343(a)(3).  This Court also has supplemental jurisdiction over the state law claims asserted herein against Defendants Cantwell, Musa, Does #1-3, Paquette, Sagendorf, Ford, Doe #4, SW Operating, and Fourth Wall pursuant to 28 U.S.C. §1367(a), because the state law and federal law claims herein arise from a common nucleus of operative facts.  This Court further has diversity jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332 in that Plaintiff is a domiciliary of Virginia and Defendants Cantwell, Musa, Does #1-3, Paquette, the City of New York, Sagendorf, Ford, SW Operating, and Fourth Wall, and on information and belief, Doe #4, are domiciliaries of New York, and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000. Venue in this district is proper because a substantial part of the events giving rise to the claims described herein occurred in the Southern District of New York.

### III. PARTIES

2. At all times relevant herein, Plaintiff Jennifer Sachs was a domiciliary of Virginia, a resident of New York, New York, and a citizen of the United States.

3. At all times relevant herein, Defendant William Cantwell was an NYPD officer assigned to the 17th Precinct.

4. At all times relevant herein, Defendant Joseph Musa was an NYPD officer assigned to the 17th Precinct.

5. At all times relevant herein, Defendant Alexandra Paquette was an NYPD officer assigned to the 17th Precinct.

6. At all times relevant herein, Defendants John Does #1, #2, and #3 were NYPD police officers assigned to the 17th Precinct.

4

7. At all times relevant herein, Defendant Aaron Sagendorf was a manager at Wollensky's Grill.

8. At all times relevant herein, Defendant Patrick Ford was a bartender at Wollensky's Grill.

9. At all times relevant herein, Defendant John Doe #4, first name Mike, was a patron of Wollensky's Grill at the time of the incident described herein.

10. At all times relevant herein, Defendant Smith & Wollensky Operating Corporation was a New York corporation that owns the restaurant by the name Smith & Wollensky on 49th Street & 3rd Avenue in Manhattan and also the adjoining Wollensky's Grill restaurant at 201 East 49th Street in Manhattan, where part of the events herein occurred.  Wollensky's Grill is an expensive restaurant that often gives free or deeply discounted food or drinks to NYPD officers, and many NYPD officers frequent it for that reason.

11. At all times relevant herein, Defendant Fourth Wall Restaurants, LLC was a New York limited liability company that manages the Wollensky's Grill restaurant.

12. At all times relevant herein, The City of New York was a municipal corporation existing under the laws of the State of New York.  As such, it maintains a police department, and has enacted rules, regulations, and policies as well as maintaining customs and practices concerning the hiring, termination, training, discipline and the conduct of the officers it employs.

## IV. STATEMENT OF FACTS

13. At all times relevant herein, Plaintiff Jennifer Sachs was a resident of New York, New York, residing at 1619 Third Avenue, Apt. 11G, New York, NY 10128.  Despite residing in New York, Plaintiff remains a Virginia domiciliary, and has a Virginia driver's license, a home

in Virginia, a Virginia mailing address, and is registered to vote in Virginia. Plaintiff is an actress and film producer who has also worked as an administrator and freelance writer.

14. At all times relevant herein, Defendant Cantwell was an NYPD officer assigned to the 17th Precinct.

15. At all times relevant herein, Defendant Musa was an NYPD officer assigned to the 17th Precinct.

16. At all times relevant herein, Defendant Paquette was an NYPD officer assigned to the 17th Precinct.

17. At all times relevant herein, Defendant Does #1-3 were NYPD officers assigned to the 17th Precinct.

18. At all times relevant herein, Defendant Sagendorf was a manager of the WG Restaurant. Sagendorf was the manager on duty at the WG Restaurant at the time of the incident described herein.

19. At all times relevant herein, Defendant Ford was a bartender at the WG Restaurant. Ford was the bartender at the WG Restaurant at the time of the incident described herein.

20. At all times relevant herein, Defendant Mike's full name and occupation are not known. Mike was a patron of the WG Restaurant at the time of the incident described herein.

21. From on or about August 2008 through March 3, 2009, Plaintiff frequented the WG Restaurant and became friendly with Ford, who often tended bar at the WG Restaurant.

22. On or about September 2008, while Plaintiff was at the WG Restaurant, Sagendorf rubbed against Plaintiff's breasts, and then pretended it was an accident. Plaintiff told Ford that she would never return to the WG Restaurant, but Ford assured her that no one would touch her anymore. After Ford's reassurance, Plaintiff began to frequent the WG Restaurant again.

Plaintiff did not know Sagendorf well, but saw that he was frequently drunk while on duty and acted hostile towards her for reasons she did not understand.   On information and belief, Sagendorf had a reputation for acting violently.

23. On or about 9 or 10 PM on March 2, 2009, Plaintiff went to the WG Restaurant to say hello to Ford.

24. On or about 1:23 AM on March 3, 2009, Ford asked Plaintiff to go home with him.

25. On or about 1:24 AM on March 3, 2009, Plaintiff declined Ford's invitation to go home with him.

26. On or about 1:25 AM on March 3, 2009, Ford started insulting Plaintiff.

27. On or about 1:27 AM on March 3, 2009, Plaintiff walked to the door of the WG Restaurant and opened it.

28. On or about 1:28 AM on March 3, 2009, Sagendorf and Mike grabbed Plaintiff, pulled her back into the WG Restaurant, manhandled, pushed, pulled, and scratched her, and slammed down her hand when she attempted to use her cell phone to dial 911.  Plaintiff is a 5'2", 105 pound female and could not possibly have been viewed as any serious threat to harm Ford, Sagendorf, or Mike, all men much larger than her.

29. On or about 1:30 AM on March 3, 2009, Plaintiff was finally able to dial 911 and reported that she was attacked.

30. On or about 1:31 AM on March 3, 2009, either Sagendorf or Mike knocked Plaintiff on the head and threw her on the ground, and she temporarily blacked out.

31. On or about 1:33 AM on March 3, 2009, Ford dialed 911 and reported that Plaintiff attacked him.

32. On or about 1:34 AM on March 3, 2009, Plaintiff was lying on the ground near the exit door of the WG Restaurant, and Mike repeatedly punched her hand and shouted "you fucking Jew" before each punch.  Plaintiff did not resist, and was not physically able to resist Mike's actions.

33. On or about 1:35 AM on March 3, 2009, Cantwell and Does #1-3 arrived at the WG Restaurant.  Despite seeing Plaintiff lying on the ground, Mike punching Plaintiff, and Mike calling Plaintiff a "fucking Jew", Cantwell and Does #1-3 did not intervene and did not speak to Plaintiff at all.

34. On or about 1:36 AM on March 3, 2009, Musa and his partner arrived at the WG Restaurant.

35. On or about 1:37 AM on March 3, 2009, despite seeing Plaintiff lying on the ground, Mike punching Plaintiff, and Mike calling Plaintiff a "fucking Jew", and not having made any attempt to hear Plaintiff's side of the story, Cantwell said "book her."

36. On or about 1:38 AM on March 3, 2009, Musa handcuffed Plaintiff.  Despite Plaintiff's hand, wrist and fingers being bloody, bruised and swollen from Mike's beating, Musa made Plaintiff's handcuffs very tight, causing her further pain.  Neither Musa nor any of the other officers present read Plaintiff her Miranda rights.

37. On or about 1:38 AM on March 3, 2009, after Musa handcuffed Plaintiff and took her outside, Plaintiff asked why she was being arrested, and Musa replied "Shut up," kicked the back of her knee, breaking it, and then threw her to the ground and kicked her head.

38. On or about 1:38 AM on March 3, 2009, Plaintiff temporarily blacked out again.

39. On or about 1:45 AM on March 3, 2009, Plaintiff was taken to the 17th Precinct.

40. On or about 2:00 AM on March 3, 2009, Plaintiff was taken to the Bellevue Hospital emergency room, which found diffuse tenderness and swelling in one of her fingers, and an abrasion in that same finger.

41. On or about 3:45 AM on March 3, 2009, Plaintiff was taken back to the 17th Precinct where she was fingerprinted by Paquette.  Plaintiff asked Paquette why Paquette was not asking Plaintiff any questions.  Paquette replied that she didn't have to ask Plaintiff any questions.  Plaintiff then asked Paquette why Plaintiff was the one arrested when Plaintiff was being beaten and called a "fucking Jew."  Paquette sarcastically replied "You weren't getting beat, you tripped and fell and he (Mike) was helping you up, remember?"

42. On or about 4:00 AM on March 3, 2009, Plaintiff was told that she was allowed to make two phone calls.  Plaintiff then called her mother, and when Plaintiff told her mother ""I'm freezing…my arm…my hand…I was falsely arrested…I want to sue the precinct", Paquette hung up the phone.  When Plaintiff's mother attempted to call back, the police would not let Plaintiff's mother talk to Plaintiff and would not let Plaintiff's mother tell the police about Plaintiff's prior injuries and medical history, which included a coma, partial paralysis, and head trauma resulting from a car accident, and from which Plaintiff still has abnormally high sensitivity to cold, and weakness and a limited range of motion on the left side of her body.  Next, Plaintiff attempted to tell the police about her prior injuries and medical history, but the police told her to "shut up" and called her a liar.

43. On or about 7:00 AM on March 3, 2009, NYPD officer Rodriguez and her partner drove Plaintiff to the New York County Criminal Court at 100 Centre Street ("NYC Criminal").  Plaintiff was taken to a nurse, who bandaged her fingers.

44. On or about 9:00 AM on March 3, 2009, Rodriguez and her partner took Plaintiff to the 20th Precinct.  On the way to the 20th Precinct, Plaintiff asked to be taken back to the hospital, and Rodriguez refused.  At the 20th Precinct, Plaintiff asked to call her attorney, and was told that she would not be allowed to use the phone since the 20th Precinct was not her arresting precinct. Plaintiff then asked the officers at the 20th Precinct if she could return to the hospital, and was told "No. You're getting out in an hour…if we take you back to the hospital, you'll have to stay another night."   Plaintiff asserts that she repeatedly requested to return to the hospital and repeatedly requested to speak with her attorney, and in both cases was always denied.

45. On or about 11:20 AM on March 3, 2009, Plaintiff told a woman at the 20th Precinct about her body temperature problem, and the woman moved her to a warmer cell.

46. On or about 3:30 PM on March 3, 2009, Sgt. Timothy Horohoe ("Horohoe") met with Plaintiff.  Plaintiff knew Horohoe's name, since her former employer Agostino von Hassell had mentioned Horohoe.  Plaintiff asked Horohoe if she could call her attorney, but he responded that he couldn't let her.  Horohoe asked about Plaintiff's injuries, and Plaintiff explained about her injuries and how the whole situation occurred.

47. From about 4:00 PM to about 9:45 PM on March 3, 2009, Plaintiff remained in her cell at the 20th Precinct.  She repeatedly asked to see her attorney or a doctor but was not allowed to see either.

48. On or about 9:45 PM on March 3, 2009, two officers from the 17th Precinct, police officer Reardon and his partner, came to the 20th Precinct to get Plaintiff and take her to NYC Criminal.  Reardon clamped shackles around Plaintiff's ankles despite the fact that she could barely walk due to the knee injury she had received, and despite the fact that Plaintiff had fully cooperated with the officers at all times and had never posed any resistance or any threat to flee.

49. On or about 10:00 PM on March 3, 2009, Plaintiff went to the courtroom at NYC Criminal, where her attorney Patricia Sullivan ("Sullivan") was waiting.  Plaintiff was arraigned on two counts of assault in the third degree (120.00) against Ford and Sagendorf, a Class A misdemeanor, and disorderly conduct (240.20), a violation, and was then released.

50. On information and belief, as a result of Plaintiff's arrest and detention on March 3, 2009, Plaintiff missed a call requesting that she substitute at the Youth Film Academy, and lost both her position and further work from the Youth Film Academy as a result.  Plaintiff had been signed to a 3-month assignment with the Youth Film Academy at $28 per hour, with a promise of continuing employment.  Plaintiff agreed to do substitute teaching before her official contract began, and her supervisor told her that if she performed well, she would receive a higher wage and additional work hours in the future.  After Plaintiff was unable to substitute that week, her supervisor wrote her to state that he deemed her absence to be a resignation, her 3-month contract was cancelled, and she has not received any further work from the Youth Film Academy.

51. On information and belief, as a result of Plaintiff's arrest and detention on March 3, 2009, Plaintiff lost a job offer through Central Casting as a stand-in on the film Salt.  Central Casting had called Plaintiff with that job offer, but after Plaintiff was unable to return the call in a timely manner, Central Casting notified her that she lost the job.  Plaintiff also lost another job offer through Central Casting and a job from ITS Models and Talent Management due to being unable to return to work due to the trauma of the incident, and she has not received any more offers from either of those agencies since then.

52. On information and belief, as a result of Plaintiff's arrest and detention on March 3, 2009, Plaintiff missed an appointment with an agent at the Fifi Oscard Agency that had a

significant probability of resulting in Plaintiff obtaining profitable work in areas that are of high interest to her.  Plaintiff had been looking for an agent in New York to represent her for acting and modeling positions, and after considerable effort had managed to land the appointment with this agent.  After Plaintiff missed the appointment, the agent declined to represent her.

53. On or about 2:30 PM on March 4, 2009, Plaintiff went to the emergency room at Lenox Hill Hospital and was diagnosed with a fractured knee.

54. On or about 12:50 PM on March 6, 2009, Plaintiff called the 19th Precinct, and they said they would send someone to her apartment so that she could file a police report.

55. On or about 1:30 PM on March 6, 2009, NYPD officer Sayers and Sgt. Preston went to Plaintiff's apartment, but told her that it would be a waste for them to file a report and that she needed to file with the 17th Precinct.

56. On or about 1:45 PM on March 6, 2009, Plaintiff called the 17th Precinct and talked to Det. Kolenda.  Kolenda first stated that Plaintiff could file a report, since there was no report against the other parties.  However, Kolenda then pulled up Plaintiff's file, and stated that Plaintiff could not file a report, since it would be retaliatory.  Kolenda said that the complaint stated that Plaintiff was fighting with everybody and hit two people.  Nevertheless, Kolenda told Plaintiff to come down to the 17th Precinct with her attorney to file a report.

57. On or about 6:00 PM on March 6, 2009, Plaintiff went with Sullivan to the 17th Precinct, and was again told that she would not be able to file a report since she was charged with assault.  After Plaintiff tried to explain that she was the victim rather than the perpetrator of the assault and that she was the one who first called police, an officer responded to Plaintiff that witnesses of the incident said that she was drunk at the time, and therefore she could not file a report.

58. On or about 11:10 PM on March 6, 2009, Plaintiff called the 20th Precinct and spoke to Sgt. Scotto, who told her to call the 19th Precinct and file a cross-complaint.

59. On or about 11:15 PM on March 6, 2009, Plaintiff called the 19th Precinct, and spoke to Sgt. Farrone, who said he would send officers out to her apartment around midnight.

60. On or about 12:00 AM on March 7, 2009, NYPD officers Delgado (shield #7850) and Bonilla went to Plaintiff's apartment, and after Plaintiff gave a description of the parties involved and her version of the events, they told her to call the station in 2-3 business days to get a complaint number and Delgado would file the report.

61. On or about March 10, 2009, Sullivan filed an order to show cause asking the court to compel the WG Restaurant to produce its surveillance tapes covering the time of the incident.

62. From about March 20, 2009 through the present, Plaintiff has seen psychiatrists, a counselor, and a neurologist to deal with the trauma of the incident, resulting in her incurring significant expenses and having to relive the events that she experienced.

63. From about April 3, 2009 through about June 19, 2009, Plaintiff attended several physical therapy sessions due to the injuries to her knee, hand, and finger that she sustained during the incident.

64. On or about 9:00 AM on April 27, 2009, at NYC Criminal, District Attorney Elise Roecker dropped Plaintiff's count of assault against Ford, and gave Plaintiff's attorney an affidavit from Sagendorf conceding that Plaintiff did not cause Sagendorf any lacerations.  The judge made Plaintiff sign a temporary order of protection agreeing to stay away from Sagendorf. The prosecution also wanted a temporary order of protection requiring Plaintiff to stay away from Ford, but was denied.

65. On or about May 27, 2009, Plaintiff filed a notice of claim against the City of New York for the claims arising from her unlawful arrest and the excessive force used in carrying out that arrest.

66. Shortly after May 27, 2009, the City of New York waived the requirement that Plaintiff comply with General Municipal Law 50-h.

67. On or about 4:00 PM on May 28, 2009, Plaintiff called the 17th Precinct to ask them to arrest Sagendorf.  The officers asked her for medical records, pictures, and other evidence confirming her version of events, and stated that without that evidence they would be unable to act.

68. On or about 9:30 AM on June 19, 2009, Plaintiff attended another hearing in the criminal case against her.

69. On or about July 15, 2009, Plaintiff received in the mail from Sgt. Russo a copy of the NYPD incident report for the events herein, which report falsely stated that Ford called 911 at 1:32 AM and Plaintiff called at 1:33 AM.

70. On or about 9:30 AM on July 16, 2009, Plaintiff attended another hearing in the criminal case against her.

71. On or about July 28, 2009, the attorney for the WG Restaurant responded to the order to show cause for the surveillance tapes by stating that (1) the WG Restaurant does not have cameras at its front door, (2) there was an electrical failure in that area at that time, and (3) the tape of the relevant time period was since overwritten.

72. On or about 9:45 AM on August 24, 2009, at NYC Criminal, all charges against Plaintiff were dismissed, and her case was sealed.

73. On or about September 14, 2009, Plaintiff called Con Ed and spoke to Mr. Gagliardi, who stated that there were no complaints of electrical failure in that area on March 3, 2009 and that surveillance systems normally have backup power and would not be affected by a general electrical failure, and gave her the contact information for the Con Ed representative who handles the WG Restaurant's account.

74. On or about November 21, 2009, Plaintiff filed a notice of claim against the City of New York for the claims arising from her malicious prosecution.

75. Shortly after November 21, 2009, the City of New York waived the requirement that Plaintiff comply with General Municipal Law 50-h.

### V. FIRST CAUSE OF ACTION - CIVIL RIGHTS AND CONSTITUTIONAL VIOLATIONS
(Against Cantwell, Musa, Paquette, and Does #1-3 only)

76. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 75 of this Complaint with the same force and effect as though fully set forth herein.

77. As a result of the actions of the Arresting Officers and Paquette, which began on or about March 3, 2009, Plaintiff was deprived of her rights under the United States Constitution and federal civil rights law.  Plaintiff's rights are secured by provisions of the due process clause of the Fourteenth Amendment, the Fourth Amendment, and 42 U.S.C. §1983.

78. The actions of the Arresting Officers and Paquette were committed under the color of law and were intentional and willful.  The Arresting Officers intentionally and willfully arrested Plaintiff without probable cause and upon information and accusations that they either knew or should have known were false and contrived, the Arresting Officers and Paquette provided false

15

information that resulted in charges being initiated against Plaintiff without probable cause and for reasons other than obtaining justice, and Musa used a degree of force to arrest Plaintiff that was far in excess of what was reasonably necessary in the situation.

79. As a result of the actions of the Arresting Officers and Paquette, which began on or about March 3, 2009, Plaintiff was falsely seized and unlawfully detained, and as a result of the actions of Musa, Plaintiff suffered physical harm.

80. The aforementioned actions of the Arresting Officers and Paquette violated Plaintiff's Fourth Amendment rights against unreasonable seizure, deprived Plaintiff of her rights to liberty and freedom without probable cause or due process in violation of the Fourteenth Amendment, and further caused Plaintiff to suffer great mental anguish, emotional distress, and public humiliation, to experience fear of physical harm and violence, to suffer lost wages through loss of employment, to suffer a high probability of financial harm through loss of prospective employment opportunities, and to incur attorney's fees and expenses.

81. The aforementioned actions of Musa violated Plaintiff's Fourth Amendment rights against unreasonable seizure, and further caused Plaintiff to suffer physical harm, incur medical expenses, suffer great mental anguish, emotional distress, and public humiliation, and incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

82. That at all times mentioned herein, the Arresting Officers and Paquette acted under color of law, but without privilege or authorization of law, and with the specific intent to deprive Plaintiff of her rights under the United States Constitution and federal civil rights law.

83. That at all times mentioned herein, the Arresting Officers and Paquette either knew or should have known that they were violating Plaintiff's rights under the United States Constitution and federal civil rights law.

84. That on or about March 3, 2009, criminal charges were initiated against Plaintiff as a result of the false information provided by Cantwell, Musa, Paquette, and Does #1-3.

85. That on or about August 24, 2009, the criminal case against Plaintiff terminated in her favor when all charges against her were dismissed.

86. That Plaintiff was charged with two counts of assault in the third degree for alleged assaults on Sagendorf and Ford, which crime requires that the offender had the intent to cause physical injury to another person, and then caused such injury to such person or to a third person.

87. In view of the facts that (1) when the Arresting Officers arrived on the scene, Plaintiff was lying on the ground and was being punched repeatedly by Mike without resistance, (2) Plaintiff is a 5'2", 105 pound female, and could not have posed any reasonable threat to Sagendorf or Ford, both males far larger than her, (3) neither Sagendorf nor Ford showed any signs of injury, and (4) neither Sagendorf, Ford, Mike, nor any other individual on the scene provided the officers with any information that would provide a reasonable person with the belief that Plaintiff caused any injury to Sagendorf or Ford, a reasonable person in the position of any of the Arresting Officers would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed assault in the third degree.

88. In view of those facts known to the Arresting Officers, a reasonable person in Paquette's position would not have had knowledge sufficient to believe that Plaintiff had committed assault in the third degree based on the information provided to her by the Arresting Officers.

89. Since a reasonable person in the position of any of the Arresting Officers or Paquette would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed assault in the third degree, there was no probable cause to charge Plaintiff with assault in the third degree.

90. That Plaintiff was charged with disorderly conduct, a crime that requires that the offender engaged in fighting or in violent, tumultuous or threatening behavior with the intent to cause public inconvenience, annoyance or alarm, or with recklessness towards creating a risk thereof.

91. In view of the facts that (1) when the Arresting Officers arrived on the scene, Plaintiff was lying on the ground and was being punched repeatedly by Mike without resistance, (2) Plaintiff is a 5'2", 105 pound female, and could not have posed any reasonable threat to Sagendorf, Ford, or Mike, all males far larger than her, and (3) neither Sagendorf, Ford, Mike, nor any other individual on the scene provided the officers with any information that would provide a reasonable person with the belief that Plaintiff had engaged in fighting or "violent, tumultuous, or threatening" behavior other than by being the victim of such behavior without fighting back, and a reasonable person in the position of any of the Arresting Officers would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct.

92. In view of those facts known to the Arresting Officers, a reasonable person in Paquette's position would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct based on the information provided to her by the Arresting Officers.

93. Since a reasonable person in the position of any of the Arresting Officers or Paquette would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct, there was no probable cause to charge Plaintiff with disorderly conduct.

94. The Arresting Officers and Paquette initiated criminal proceedings against Plaintiff when they knew that there was no probable cause to charge Plaintiff for the offenses charged, and did so for motives other than obtaining justice, such as (1) alleging that Plaintiff was the instigator of the violence so that Sagendorf, Ford, or Mike would not be charged, (2) to maintain goodwill at the WG Restaurant, which often provided NYPD officers with free food and drinks that would otherwise be very expensive, or (3) to help their fellow officers justify Plaintiff's arrest.

95. For the Arresting Officers and Paquette to initiate criminal proceedings against Plaintiff without probable cause and with a motive other than obtaining justice was an act of actual malice against Plaintiff.

96. As a result of the actions of the Arresting Officers and Paquette, Plaintiff experienced a deprivation of liberty as she was wrongfully arrested and detained and had to attend numerous criminal proceedings over a six month period.

97. The actions of the Arresting Officers and Paquette amounted to malicious prosecution in violation of 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

98. That on or about March 3, 2009, the Arresting Officers intended to arrest Plaintiff, and specifically, Cantwell gave the command for her arrest, and Musa physically carried out her arrest.

99. That on or about March 3, 2009, Plaintiff was conscious of being arrested.

100. That on or about March 3, 2009, Plaintiff at no time consented to being arrested by the Arresting Officers, but nonetheless cooperated with them since they were officers of the NYPD acting in an official capacity.

101. In view of the facts that (1) when the Arresting Officers arrived on the scene, Plaintiff was lying on the ground and was being punched repeatedly by Mike without resistance, (2) Plaintiff is a 5'2", 105 pound female, and could not have posed any reasonable threat to Sagendorf, Ford, or Mike, all males far larger than her, (3) neither Sagendorf nor Ford showed any signs of injury, and (4) Plaintiff called 911 and reported that she was attacked prior to the time that Ford called 911 and reported that Plaintiff was the attacker, a reasonable person in the position of any of the Arresting Officers would not have believed and would not have had knowledge sufficient to believe that Plaintiff was committing or had committed a crime at the time of arrest.

102. In view of the fact that the Arresting Officers did not possess information upon which a reasonable person could have believed that Plaintiff had committed or was committing a crime at the time of arrest, the Arresting Officers did not have probable cause to arrest Plaintiff.

103. That neither on nor about March 3, 2009, nor at any other relevant time herein, did any of the Arresting Officers possess a warrant for Plaintiff's arrest, nor did such a warrant for Plaintiff's arrest exist.

104. In view of the fact that the Arresting Officers intended to arrest Plaintiff, Plaintiff was conscious of her arrest, Plaintiff did not consent to her arrest, and the arrest was not privileged since it was not conducted pursuant to a warrant or probable cause, Plaintiff's arrest was therefore unlawful and actionable under 42 U.S.C. §1983.

105. The Arresting Officers' actions were the direct and proximate cause of Plaintiff's unlawful arrest.

106. The actions of the Arresting Officers amounted to false arrest in violation of 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

107. That on or about March 3, 2009, the Arresting Officers intended to confine Plaintiff.

108. That on or about March 3, 2009, Plaintiff was conscious of being confined.

109. That on or about March 3, 2009, Plaintiff at no time consented to being confined by the Arresting Officers, but nonetheless cooperated with them since they were officers of the NYPD acting in an official capacity.

110. In view of the facts that (1) when the Arresting Officers arrived on the scene, Plaintiff was lying on the ground and was being punched repeatedly by Mike without resistance, (2) Plaintiff is a 5'2", 105 pound female, and could not have posed any reasonable threat to Sagendorf, Ford, or Mike, all males far larger than her, (3) neither Sagendorf nor Ford showed any signs of injury, and (4) Plaintiff called 911 and reported that she was attacked prior to the time that Ford called 911 and reported that Plaintiff was the attacker, a reasonable person in the position of any of the Arresting Officers would not have believed and would not have had knowledge sufficient to believe that Plaintiff was committing or had committed a crime at the time of arrest.

111. In view of the fact that the Arresting Officers did not possess information upon which a reasonable person could have believed that Plaintiff had committed or was committing a crime at the time of arrest, the Arresting Officers did not have probable cause to confine Plaintiff.

112. That neither on nor about March 3, 2009, nor at any other relevant time herein, did any of the Arresting Officers possess a warrant for Plaintiff's confinement, nor did such a warrant for Plaintiff's confinement exist.

113. In view of the fact that the Arresting Officers intended to confine Plaintiff, Plaintiff was conscious of her confinement, Plaintiff did not consent to her confinement, and the confinement was not privileged since it was not conducted pursuant to a warrant or probable cause, Plaintiff's confinement was therefore unlawful and actionable under 42 U.S.C. §1983.

114. The Arresting Officers' actions were the direct and proximate cause of Plaintiff's unlawful confinement.

115. The actions of the Arresting Officers amounted to false imprisonment in violation of 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

116. That in the course of Musa's arrest of Plaintiff, Musa intentionally and willfully kicked the back of her knee, breaking it, and then threw her to the ground and kicked her head.

117. In light of the fact that Plaintiff had cooperated fully with Musa, had not resisted, and could not reasonably have been seen as posing a danger to any officers or bystanders on the scene, Musa's use of force against Plaintiff was far in excess of what would be objectively reasonable in the situation, and amounted to excessive force in violation of 42 U.S.C. §1983 and the Fourth Amendment to the United States Constitution.

118. As a result of the actions of the Arresting Officers and Paquette, Plaintiff was caused to suffer a loss of freedom and liberty, great mental anguish, emotional distress, and public humiliation, to experience fear of physical harm and violence, to suffer lost wages through loss of employment, to suffer a high probability of financial harm through loss of prospective employment opportunities, and to incur attorney's fees and expenses.

22

119. As a result of the specific actions of Musa in using excessive force against Plaintiff, Plaintiff was caused to suffer physical harm, to incur medical expenses, to suffer great mental anguish, emotional distress, and public humiliation, and to incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

## VI. SECOND CAUSE OF ACTION -
## STATE LAW ASSAULT
### (Against Musa only)

120. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 119 of this Complaint with the same force and effect as though fully set forth herein.

121. That on or about March 3, 2009, Plaintiff's hand, wrist, and fingers were bloody, bruised and swollen from Mike's beating.

122. That on or about March 3, 2009, Musa intentionally and willfully moved towards Plaintiff with handcuffs in such a manner as would make a reasonable person in Plaintiff's position believe that Musa was about to clasp handcuffs on her already-injured hands and thereby harm her further.

123. Musa's actions of moving to place handcuffs on Plaintiff were not privileged, since Plaintiff's arrest was not conducted pursuant to probable cause or a valid warrant.

124. Musa's actions of moving to place handcuffs on Plaintiff placed her in imminent apprehension of harmful or offensive bodily contact and thereby constituted the tort of assault.

125. That on or about March 3, 2009, after Musa handcuffed Plaintiff and took her outside, Plaintiff asked why she was being arrested, and Musa intentionally and willfully moved towards Plaintiff in such a manner as would make a reasonable person in Plaintiff's position believe that Musa was about to kick her knee, throw her to the ground, and kick her head.

126. Musa's actions of moving to kick Plaintiff in the knee, throw her to the ground, and kick her head were not privileged, since Plaintiff had cooperated fully with Musa, had not resisted, and could not reasonably have been seen as posing a danger to any officers or bystanders on the scene.

127. Musa's actions of moving to kick Plaintiff's knee, throw her to the ground, and kick her head placed her in imminent apprehension of harmful or offensive bodily contact and thereby constituted the tort of assault.

128. As a direct and proximate result of Musa's assault on Plaintiff, Plaintiff was caused to suffer great mental anguish, emotional distress, and public humiliation, and to incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

## VII. THIRD CAUSE OF ACTION - STATE LAW BATTERY
### (Against Musa only)

129. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 128 of this Complaint with the same force and effect as though fully set forth herein.

130. That on or about March 3, 2009, Plaintiff's hand, wrist, and fingers were bloody, bruised and swollen from Mike's beating.

131. That on or about March 3, 2009, Musa intentionally and willfully placed handcuffs on Plaintiff's already-injured hands and made them very tight, and did so without Plaintiff's consent.

132. Musa's actions of placing handcuffs on Plaintiff were not privileged, since Plaintiff's arrest was not conducted pursuant to probable cause or a valid warrant.

133. Musa's actions of making Plaintiff's handcuffs very tight were a use of force in excess of what could reasonably be deemed necessary in the situation and were therefore not privileged, since Plaintiff had cooperated fully with Musa, had not resisted, and could not reasonably have been seen as posing a danger to any officers or bystanders on the scene.

134. Musa's actions of placing handcuffs on Plaintiff and making them very tight were an intentional and harmful physical contact with Plaintiff without her consent and thereby constituted the tort of battery.

135. That on or about March 3, 2009, after Musa handcuffed Plaintiff and took her outside, Plaintiff asked why she was being arrested, and Musa intentionally and willfully kicked the back of her knee, breaking it, and then threw her to the ground and kicked her head.  Plaintiff clearly did not consent to any such conduct by Musa.

136. Musa's actions of kicking Plaintiff in the knee, throwing her to the ground, and kicking her head were not privileged, since Plaintiff had cooperated fully with Musa, had not resisted, and could not reasonably have been seen as posing a danger to any officers or bystanders on the scene.

137. Musa's actions of kicking Plaintiff's knee, throwing her to the ground, and kicking her head were intentional and harmful physical contacts with Plaintiff without her consent and thereby constituted the tort of battery.

138. As a direct and proximate result of Musa's battery of Plaintiff, Plaintiff was caused to suffer physical harm, to incur medical expenses, to suffer great mental anguish, emotional distress, and public humiliation, and to incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

## VIII. FOURTH CAUSE OF ACTION -

## STATE LAW UNLAWFUL ARREST
### (Against Cantwell, Musa, and Does #1-3 only)

139. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 138 of this Complaint with the same force and effect as though fully set forth herein.

140. That on or about March 3, 2009, the Arresting Officers intended to arrest Plaintiff, and specifically, Cantwell gave the command for Plaintiff's arrest, and Musa physically carried out her arrest.

141. That on or about March 3, 2009, Plaintiff was conscious of being arrested.

142. That on or about March 3, 2009, Plaintiff at no time consented to being arrested by the Arresting Officers, but nonetheless cooperated with them since they were officers of the NYPD acting in an official capacity.

143. In view of the facts that (1) when the Arresting Officers arrived on the scene, Plaintiff was lying on the ground and was being punched repeatedly by Mike without resistance, (2) Plaintiff is a 5'2", 105 pound female, and could not have posed any reasonable threat to Sagendorf, Ford, or Mike, all males far larger than her, (3) neither Sagendorf nor Ford showed any signs of injury, and (4) Plaintiff called 911 and reported that she was attacked prior to the time that Ford called 911 and reported that Plaintiff was the attacker, a reasonable person in the position of any of the Arresting Officers would not have believed and would not have had knowledge sufficient to believe that Plaintiff was committing or had committed a crime at the time of arrest.

144. In view of the fact that the Arresting Officers did not possess information upon which a reasonable person could have believed that Plaintiff had committed or was committing a crime at the time of arrest, the Arresting Officers did not have probable cause to arrest and confine Plaintiff.

145. That neither on nor about March 3, 2009, nor at any other relevant time herein, did any of the Arresting Officers possess a warrant for Plaintiff's arrest and confinement, nor did such a warrant for Plaintiff's arrest and confinement exist.

146. In view of the fact that the Arresting Officers intended to arrest Plaintiff, Plaintiff was conscious of her arrest, Plaintiff did not consent to her arrest, and the arrest was not privileged since it was not conducted pursuant to a warrant or probable cause, Plaintiff's arrest was therefore unlawful and actionable under the common law of the State of New York.

147. The actions of the Arresting Officers amounted to unlawful arrest under the New York State common law.

148. As a direct and proximate result of Plaintiff's unlawful arrest, Plaintiff was caused to suffer a loss of freedom and liberty, great mental anguish, emotional distress, and public humiliation, to experience fear of physical harm and violence, to suffer lost wages through loss of employment, to suffer a high probability of financial harm through loss of prospective employment opportunities, and to incur attorney's fees and expenses.

### IX. FIFTH CAUSE OF ACTION - STATE LAW MALICIOUS PROSECUTION (Against Cantwell, Musa, Paquette, and Does #1-3 only)

149. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 148 of this Complaint with the same force and effect as though fully set forth herein.

150. That on or about March 3, 2009, criminal charges were initiated against Plaintiff as a result of the false information provided by Cantwell, Musa, Paquette, and Does #1-3.

151. That on or about August 24, 2009, the criminal case against Plaintiff terminated in her favor when all charges against her were dismissed.

27

152. That Plaintiff was charged with two counts of assault in the third degree for alleged assaults on Sagendorf and Ford, which crime requires that the offender had the intent to cause physical injury to another person, and then caused such injury to such person or to a third person.

153. In view of the facts that (1) when the Arresting Officers arrived on the scene, Plaintiff was lying on the ground and was being punched repeatedly by Mike without resistance, (2) Plaintiff is a 5'2", 105 pound female, and could not have posed any reasonable threat to Sagendorf or Ford, both males far larger than her, (3) neither Sagendorf nor Ford showed any signs of injury, (4) neither Sagendorf, Ford, Mike, nor any other individual on the scene provided the officers with any information that would provide a reasonable person with the belief that Plaintiff caused any injury to Sagendorf or Ford, a reasonable person in the position of any of the Arresting Officers would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed assault in the third degree.

154. In view of those facts known to the Arresting Officers, a reasonable person in Paquette's position would not have had knowledge sufficient to believe that Plaintiff had committed assault in the third degree based on the information provided to her by the Arresting Officers.

155. Since a reasonable person in the position of any of the Arresting Officers or Paquette would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed assault in the third degree, there was no probable cause to charge Plaintiff with assault in the third degree.

156. That Plaintiff was charged with disorderly conduct, a crime that requires that the offender engaged in fighting or in violent, tumultuous, or threatening behavior with the intent to

cause public inconvenience, annoyance, or alarm, or with recklessness towards creating a risk thereof.

157. In view of the facts that (1) when the Arresting Officers arrived on the scene, Plaintiff was lying on the ground and was being punched repeatedly by Mike without resistance, (2) Plaintiff is a 5'2", 105 pound female, and could not have posed any reasonable threat to Sagendorf, Ford, or Mike, all males far larger than her, and (3) neither Sagendorf, Ford, Mike, nor any other individual on the scene provided the officers with any information that would provide a reasonable person with the belief that Plaintiff had engaged in fighting or "violent, tumultuous or threatening" behavior other than by being the victim of such behavior without fighting back, and a reasonable person in the position of any of the Arresting Officers would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct.

158. In view of those facts known to the Arresting Officers, a reasonable person in Paquette's position would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct based on the information provided to her by the Arresting Officers.

159. Since a reasonable person in the position of any of the Arresting Officers or Paquette would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct, there was no probable cause to charge Plaintiff with disorderly conduct.

160. The Arresting Officers and Paquette initiated criminal proceedings against Plaintiff when they knew that there was no probable cause to charge Plaintiff for the offenses charged, and did so for motives other than obtaining justice, such as (1) alleging that Plaintiff was the

instigator of the violence so that Sagendorf, Ford, or Mike would not be charged, (2) to maintain goodwill at the WG Restaurant, which often provided NYPD officers with free food and drinks that would otherwise be very expensive, or (3) to help their fellow officers justify Plaintiff's arrest.

161. For the Arresting Officers and Paquette to initiate criminal proceedings against Plaintiff without probable cause and with a motive other than obtaining justice was an act of actual malice against Plaintiff.

162. As a result of the actions of the Arresting Officers and Paquette, Plaintiff was caused to suffer a loss of freedom and liberty, great mental anguish, emotional distress, and public humiliation, to experience fear of physical harm and violence, to suffer lost wages through loss of employment, to suffer a high probability of financial harm through loss of prospective employment opportunities, and to incur attorney's fees and expenses.

163. The actions of the Arresting Officers and Paquette amounted to malicious prosecution under the New York State common law.

### X. SIXTH CAUSE OF ACTION - CIVIL RIGHTS AND CONSTITUTIONAL VIOLATIONS (Against the City of New York only)

164. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 163 of this Complaint with the same force and effect as though fully set forth herein.

165. On information and belief, responsible officials of the City of New York maintained customs, policies, and practices regarding the supervision and/or training of NYPD officers that led to deprivations of Plaintiff's rights under the 4th and 14th Amendments to the United States Constitution.

166. Responsible officials of Defendant City of New York knew or should have known that if they failed to supervise or train NYPD officers effectively so as to prevent them from violating the constitutional rights of individuals by making unlawful arrests and initiating charges against individuals without probable cause, the obvious consequence would be that some officers would nonetheless engage in such conduct for various reasons other than to achieve justice in accordance with the law, such as (A) to make arrests and initiate prosecutions in order to advance their careers, (B) to gain media attention by arresting and charging high-profile suspects, (C) to protect a third party friendly to the officer who might otherwise be charged with the conduct alleged, (D) to maintain goodwill with a third party seeking the prosecution of such individual, or (E) to obtain charges against a suspect when an officer believes that the suspect is guilty but the evidence against that suspect is not sufficient to initiate the charges alleged.

167. In light of the above, responsible officials of Defendant City of New York knew to a moral certainty that NYPD officers would frequently confront situations in which there were powerful incentives to make unlawful arrests or initiate charges against individuals without probable cause.

168. Responsible officials of Defendant City of New York knew that when NYPD officers confront situations in which there were powerful incentives to make unlawful arrests or initiate charges against individuals without probable cause, if those officers are properly supervised and disciplined they would almost always be deterred from making unlawful arrests or initiating charges against individuals without probable cause due to the understanding that they would be held accountable if they do so, and if those officers were properly trained, they would be fully aware of (A) when it is legal to arrest a suspect, (B) when it is appropriate to bring charges against an individual, (C) their responsibilities under the law to make only lawful arrests and initiate

31

charges only with probable cause, and (D) the consequences they would face for unlawful arrests or malicious prosecutions.

169. Responsible officials of Defendant City of New York knew that the consequence of NYPD officers making unlawful arrests or initiating charges against individuals without probable cause would be the deprivation of the constitutional rights of citizens, such as unlawful arrests, wrongful imprisonment, and malicious prosecutions of citizens, thereby violating those citizens' Fourth and Fourteenth Amendment rights.

170. In light of fact that the responsible officials of Defendant City of New York knew or should have known that if they failed to supervise the officers of the NYPD effectively so as to prevent them from violating the constitutional rights of individuals by making unlawful arrests and initiating charges against individuals without probable cause, the obvious consequence would be that some officers would make unlawful arrests and initiate charges against individuals without probable cause for various reasons other than achieving justice in accordance with the law, said officials had a duty to supervise and/or train NYPD officers effectively, and said officials' failure to do so represents a deliberate indifference to the constitutional rights of Plaintiff and other individuals who were unlawfully arrested or maliciously prosecuted.

171. Responsible officials of Defendant City of New York knew to a moral certainty that New York City police officers will frequently confront the situation of needing to arrest a suspect without using excessive force. This situation presents police officers with a difficult choice that proper training and supervision will make less difficult – training in order to understand the proper degree of force that is appropriate based upon the suspect's actions and the situation, and supervision in order to deter officers from using excessive force in order to make it easier to control or arrest a suspect. When an officer uses excessive force to control or arrest a

suspect, the result will often be a deprivation of that suspect's constitutional rights, such as the suspect's Fourth Amendment right against unreasonable seizures.

172. In light of fact that responsible officials of Defendant City of New York knew or should have known that if they failed to train and supervise the officers of the NYPD effectively so as to prevent them from violating the constitutional rights of individuals by using excessive force during arrests, the obvious consequence would be that some officers would use excessive force for various reasons other than achieving justice in accordance with the law, such as (A) to guarantee a suspect's immediate and total compliance despite the fact that the suspect's actions and the situation did not justify the degree of force used, (B) to retaliate against a suspect for actions alleged to have been committed by the suspect, or (C) to intimidate a suspect into being more likely to confess to have committed a crime regardless of the suspect's actual guilt, said officials had a duty to supervise and/or train NYPD officers effectively, and said officials' failure to do so represents a deliberate indifference to the constitutional rights of Plaintiff and other individuals who experience excessive force from NYPD officers during arrests.

173. The failure of responsible officials of Defendant City of New York to respond in a timely and effective fashion to properly supervise and/or discipline the Arresting Officers and Paquette and other officers of the NYPD so as to prevent them from violating the constitutional rights of individuals by making unlawful arrests, initiating charges against individuals without probable cause, and using excessive force while arresting individuals, knowing that such failure to properly supervise and discipline its officers was virtually certain to result in violations of individuals' constitutional rights, signifies a policy or custom of inaction by those officials and represents deliberate indifference to the constitutional rights of Plaintiff.

174. As a direct and proximate result of the aforesaid acts of responsible officials of Defendant City of New York, Plaintiff was caused to suffer physical harm, to incur medical expenses, to suffer a loss of freedom and liberty, great mental anguish, emotional distress, and public humiliation, to experience fear of physical harm and violence, to suffer lost wages through loss of employment, to suffer a high probability of financial harm through loss of prospective employment opportunities, to incur attorney's fees and expenses, and to incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

175. As a result of the foregoing, Plaintiff sustained the damages previously described, and seeks compensatory damages from the City of New York.

176. Plaintiff timely served and properly executed notices of claim on the City of New York for claims arising out of her unlawful arrest, malicious prosecution, and excessive force used by NYPD officers.

177. After Plaintiff filed each of her two notices of claim, the City of New York in each case waived Plaintiff's compliance with General Municipal Law 50-h.

## XI. SEVENTH CAUSE OF ACTION - STATE LAW ASSAULT
### (Against Sagendorf, Doe #4, SW Operating, and Fourth Wall only)

178. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 177 of this Complaint with the same force and effect as though fully set forth herein.

179. That on or about 1:28 AM on March 3, 2009, when Plaintiff was trying to leave the WG Restaurant, Sagendorf and Mike intentionally and willfully approached her in such a manner

as would make a reasonable person in Plaintiff's position believe that Sagendorf and Mike were about to attack her.

180. Sagendorf and Mike's actions were not privileged, since Plaintiff is a 5'2", 105 pound female and could not possibly have been viewed as any serious threat to harm Ford, Sagendorf, or Mike, all men much larger than her.

181. Sagendorf and Mike's actions of approaching Plaintiff in a manner that would make a reasonable person in her position believe that she was about to be under attack placed her in imminent apprehension of harmful or offensive bodily contact and thereby constituted the tort of assault.

182. That on or about 1:34 AM on March 3, 2009, when Plaintiff was lying on the ground near the exit door of the WG Restaurant, Mike intentionally and willfully moved towards Plaintiff in such a manner as would make a reasonable person in Plaintiff's position believe that Mike was going to punch her hand.

183. Mike's actions were not privileged, since Plaintiff did not resist, and was not physically able to resist Mike's actions.

184. Mike's actions of approaching Plaintiff in a manner that would make a reasonable person in her position believe that he was about to punch her hand placed her in imminent apprehension of harmful or offensive bodily contact and thereby constituted the tort of assault.

185. On or about March 3, 2009, Sagendorf was an employee of the WG Restaurant, which was owned by SW Operating and managed by Fourth Wall.

186. At the time of Sagendorf's assault on Plaintiff, Sagendorf was on duty at the WG Restaurant as the WG Restaurant's manager.

187. On information and belief, while Sagendorf was on duty, in the event that a patron became violent or abusive, he would act to suppress that patron by acting in such a manner as to place that patron in imminent apprehension of being manhandled, pushed, or pulled.

188. While Plaintiff did not act violently or abusively at any time during the events herein, Sagendorf's actions that placed Plaintiff in imminent apprehension of being manhandled, pushed, and pulled are actions that would normally be carried out by a bar or restaurant employee in the event that a patron became violent or abusive.

189. On information and belief, Sagendorf's actions that placed Plaintiff in imminent apprehension of being manhandled, pushed, and pulled were not a departure from normal methods of procedure at the WG Restaurant when handling violent or abusive patrons; provided, however, that in this situation Plaintiff did not act violently or abusively at any time during the events herein.

190. The WG Restaurant, SW Operating, and Fourth Wall were aware or should have been aware of Sagendorf's propensity for aggressive conduct, and should have reasonably anticipated that Sagendorf would act in this manner.

191. SW Operating, the owner of the WG Restaurant, and Fourth Wall, the managing company running the WG Restaurant, would therefore be liable for Sagendorf's assault of Plaintiff.

192. As a direct and proximate result of Sagendorf's assault on Plaintiff, for which SW Operating and Fourth Wall were vicariously liable, and as a direct and proximate result of Mike's assault on Plaintiff, Plaintiff was caused to suffer great mental anguish, emotional distress, and public humiliation, and to incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

## XII. EIGHTH CAUSE OF ACTION -
## STATE LAW BATTERY
## (Against Sagendorf, Doe #4, SW Operating, and Fourth Wall only)

193. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 192 of this Complaint with the same force and effect as though fully set forth herein.

194. That on or about 1:28 AM on March 3, 2009, Sagendorf and Mike grabbed Plaintiff, pulled her back into the WG Restaurant, manhandled, pushed, pulled, and scratched her, and slammed down her hand when she attempted to use her cell phone to dial 911.

195. Sagendorf and Mike's actions were not privileged, since Plaintiff clearly did not consent to any such conduct from Sagendorf and Mike, and since Plaintiff is a 5'2", 105 pound female and could not possibly have been viewed as any serious threat to harm Ford, Sagendorf, or Mike, all men much larger than her.

196. Sagendorf and Mike's actions of grabbing Plaintiff, pulling her back into the WG Restaurant, manhandling, pushing, pulling, and scratching her, and slamming down her hand constituted intentional and harmful physical contacts with Plaintiff without her consent and thereby constituted the tort of battery.

197. That on or about 1:34 AM on March 3, 2009, Plaintiff was lying on the ground near the exit door of the WG Restaurant, and Mike repeatedly punched her hand and shouted "you fucking Jew" before each punch.  Plaintiff did not resist, and was not physically able to resist Mike's actions.

198. Mike's actions were not privileged, since Plaintiff clearly did not consent to any such conduct from Mike, and since Plaintiff did not resist, and was not physically able to resist Mike's actions.

199. Mike's actions of repeatedly punching Plaintiff's hand constituted intentional and harmful physical contact with Plaintiff without her consent and thereby constituted the tort of battery.

200. On or about March 3, 2009, Sagendorf was an employee of the WG Restaurant, which was owned by SW Operating and managed by Fourth Wall.

201. At the time of Sagendorf's assault on Plaintiff, Sagendorf was on duty at the WG Restaurant as the WG Restaurant's manager.

202. On information and belief, while Sagendorf was on duty, in the event that a patron became violent or abusive, he would act to suppress that patron by manhandling, pushing, and pulling that patron.

203. While Plaintiff did not act violently or abusively at any time during the events herein, Sagendorf's actions in manhandling, pushing, and pulling Plaintiff are actions that would normally be carried out by a bar or restaurant employee in the event that a patron became violent or abusive.

204. On information and belief, Sagendorf's actions in manhandling, pushing, and pulling Plaintiff were not a departure from normal methods of procedure at the WG Restaurant when handling violent or abusive patrons; provided, however, that in this situation Plaintiff did not act violently or abusively at any time during the events herein.

205. The WG Restaurant, SW Operating, and Fourth Wall were aware or should have been aware of Sagendorf's propensity for aggressive conduct, and should have reasonably anticipated that Sagendorf would act in this manner.

206. SW Operating, the owner of the WG Restaurant, and Fourth Wall, the managing company running the WG Restaurant, would therefore be liable for Sagendorf's battery of Plaintiff.

207. As a direct and proximate result of Sagendorf's battery of Plaintiff, for which SW Operating and Fourth Wall were vicariously liable, and as a direct and proximate result of Mike's battery of Plaintiff, Plaintiff was caused to suffer physical harm, to incur medical expenses, to suffer great mental anguish, emotional distress, and public humiliation, and to incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

## XIII. NINTH CAUSE OF ACTION - STATE LAW MALICIOUS PROSECUTION (Against Sagendorf, Ford, Doe #4, SW Operating, and Fourth Wall only)

208. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 207 of this Complaint with the same force and effect as though fully set forth herein.

209. As a result of the actions of Sagendorf, Ford, and Mike, including Ford providing false information in his 911 call and Sagendorf, Ford, and Mike providing false information to the Arresting Officers, criminal charges were initiated against Plaintiff.

210. That on or about August 24, 2009, the criminal case against Plaintiff terminated in her favor when all charges against her were dismissed.

211. That based on the false information in Ford's 911 call and provided to the Arresting Officers by Sagendorf, Ford, and Mike, Plaintiff was charged with two counts of assault in the third degree for alleged assaults on Sagendorf and Ford.  The crime of assault requires that the

offender caused physical injury to another person, with the degree of assault varying by the circumstances and severity of the injury.

212. In view of the facts that (1) Plaintiff never caused any physical injury to anyone present in the WG Restaurant, (2) Plaintiff was the victim rather than the perpetrator of the violence, (3) Plaintiff did not resist and was not physically able to resist being punched repeatedly by Mike while on the ground, and (4) neither Sagendorf nor Ford showed any signs of injury, a reasonable person in the position of Sagendorf, Ford, and Mike would not have believed that Plaintiff caused any injury to Sagendorf or Ford or anyone else at the WG Restaurant on March 3, 2009.

213. Since a reasonable person in the position of Sagendorf, Ford, or Mike would not have believed and would not have had knowledge sufficient to believe that Plaintiff had caused any injury to anyone, there was no probable cause for Sagendorf, Ford, or Mike to charge Plaintiff with assault.

214. That Plaintiff was charged with disorderly conduct, a crime that in the specific form applied to Plaintiff requires that the offender engaged in fighting or in violent, tumultuous or threatening behavior with the intent to cause public inconvenience, annoyance or alarm, or with recklessness towards creating a risk thereof.

215. In view of the facts that (1) Plaintiff did not engage in fighting, but was attacked by Sagendorf and Mike without provocation and did not resist, and (2) Plaintiff did not engage in violent, tumultuous or threatening behavior except by being the victim of same, a reasonable person in the position of Sagendorf, Ford, or Mike would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct.

216. Since a reasonable person in the position of any of Sagendorf, Ford, and Mike would not have believed and would not have had knowledge sufficient to believe that Plaintiff had committed disorderly conduct, there was no probable cause to charge Plaintiff with disorderly conduct.

217. Sagendorf and Ford initiated criminal proceedings against Plaintiff when they knew that there was no probable cause to charge Plaintiff for the offenses alleged, and did so for motives other than obtaining justice, such as (1) to allege that Plaintiff was the instigator of the violence so that Sagendorf, Ford, or Mike would not be charged, (2) to protect their good standing as employees of the WG Restaurant by blaming Plaintiff for the incident, or (3) to retaliate against Plaintiff for rejecting their sexual advances.

218. For Sagendorf and Ford to initiate criminal proceedings against Plaintiff without probable cause and with a motive other than obtaining justice was an act of actual malice against Plaintiff.

219. For Mike to provide false information that assisted Sagendorf and Ford's efforts to initiate criminal proceedings against Plaintiff without probable cause and with a motive other than obtaining justice was an act of actual malice against Plaintiff.

220. As a result of the actions of Sagendorf, Ford, and Mike, Plaintiff was caused to suffer a loss of freedom and liberty, great mental anguish, emotional distress, and public humiliation, to experience fear of physical harm and violence, to suffer lost wages through loss of employment, to suffer a high probability of financial harm through loss of prospective employment opportunities, and to incur attorney's fees and expenses.

221. The actions of Sagendorf, Ford, and Mike amounted to malicious prosecution under the New York State common law.

222. On or about March 3, 2009, Sagendorf and Ford were employees of the WG Restaurant, which was owned by SW Operating and managed by Fourth Wall.

223. At the time of Sagendorf's assault on Plaintiff, Sagendorf was on duty at the WG Restaurant as the WG Restaurant's manager, and Ford was on duty at the WG Restaurant as the WG Restaurant's bartender.

224. On information and belief, while Sagendorf and Ford were on duty, in the event that an employee was in a dispute with a patron, Sagendorf and Ford would take the side of the employee and provide testimony in favor of the employee.

225. Sagendorf and Ford's actions in maliciously prosecuting Plaintiff are actions that would normally be carried out by a bar or restaurant employee in the event that a patron of a bar or restaurant had a dispute with an employee.

226. On information and belief, Sagendorf and Ford's actions in maliciously prosecuting Plaintiff were not a departure from normal methods of procedure at the WG Restaurant when a patron had a dispute with an employee.

227. The WG Restaurant, SW Operating, and Fourth Wall knew or should have known about Sagendorf and Ford's propensity to act in a dishonest manner when a patron had a dispute with an employee, and should have reasonably anticipated that Sagendorf and Ford would act in this manner.

228. SW Operating, the owner of the WG Restaurant, and Fourth Wall, the managing company running the WG Restaurant, would therefore be liable for Sagendorf and Ford's malicious prosecution of Plaintiff.


### XIV. TENTH CAUSE OF ACTION - STATE LAW NEGLIGENT RETENTION

**(Against SW Operating and Fourth Wall only)**

229. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 228 of this Complaint with the same force and effect as though fully set forth herein.

230. SW Operating, as the owner of the WG Restaurant, and Fourth Wall, as the managing company running the WG Restaurant, had a duty to Plaintiff as a patron of the WG Restaurant not to retain as employees of the WG Restaurant any individuals who have a tendency to act violently towards patrons.

231. On information and belief, Sagendorf had acted violently towards patrons on prior occasions of which SW Operating and Fourth Wall were aware or should have been aware.

232. SW Operating and Fourth Wall knew or should have known of Sagendorf's propensity for aggressive conduct towards patrons.

233. SW Operating, as the owner of the WG Restaurant, and Fourth Wall, as the managing company running the WG Restaurant, breached their duty to Plaintiff as a patron of the WG Restaurant when they retained Sagendorf as an employee of the WG Restaurant despite his tendency to act violently towards patrons.

234. SW Operating and Fourth Wall's negligence in retaining Sagendorf as an employee despite his tendency to act violently towards patrons was the proximate cause of Sagendorf's assault and battery of Plaintiff.

235. The actions of SW Operating and Fourth Wall amounted to negligent retention under the New York State common law.

236. SW Operating and Fourth Wall's negligence in retaining Sagendorf as an employee despite his tendency to act violently towards patrons caused Plaintiff to suffer physical harm, to

incur medical expenses, to suffer great mental anguish, emotional distress, and public humiliation, and to incur the expenses of seeing psychiatrists, a counselor, and a neurologist in an attempt to deal with the trauma she experienced.

WHEREFORE Plaintiff demands judgment against each Defendant in the amount of Five Million Dollars ($5,000,000.00) in compensatory damages and Five Million Dollars ($5,000,000.00) in punitive damages on the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth causes of action, and Five Million Dollars ($5,000,000.00) in compensatory damages on the Sixth cause of action, together with attorneys' fees, and the costs and disbursements associated with bringing this action.

Dated: New York, New York
      March 2, 2010

Respectfully submitted,

LEBOW & ASSOCIATES, PLLC

_____

James B. LeBow, Esq. (JL4535)
5 Penn Plaza, 19th Floor
New York, New York 10001
Tel. (212) 868-3311
Fax (646) 619-4555