UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                   :

JENNIFER SACHS,                     :

                    Plaintiff,   :

                                 :           10 Civ. 1663 (JPO)

             -against-         :

                                 :         <u>MEMORANDUM</u>

WILLIAM CANTWELL, *et al.*,     :      <u>OPINION AND ORDER</u>

                    Defendants.  :

                                 :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Plaintiff Jennifer Sachs ("Plaintiff") filed this lawsuit asserting various claims arising out

of an incident that occurred in March 2009 at the bar of Wollensky's Grill in Manhattan.

Plaintiff brings suit against the City of New York, Police Officer William Cantwell, Police

Officer Joseph Musa, Police Officer Alexandra Paquette, and John Doe Police Officers #1-3

(collectively, the "City Defendants"); and against Patrick Ford, Aaron Sagendorf, John Doe #4

(referred to by the parties as "Mike"), Smith & Wollensky Operating Corporation ("S&W

Operating"), and Fourth Wall Restaurants, LLC ("Fourth Wall") (collectively, the "Private

Defendants").

      Plaintiff asserts the following claims against the City Defendants:  constitutional claims

under 28 U.S.C. § 1983 against all of the City Defendants for false arrest, malicious prosecution,

and excessive use of force in violation of her constitutional rights; state law assault and battery

claims against Officer Musa for using excessive force during Plaintiff's arrest; state law false

arrest claims against Officer Cantwell, Officer Musa, and John Doe Officers #1-3; state law

malicious prosecution claims against all of the Defendant Police Officers; and a *Monell* claim against the City of New York.

Plaintiff asserts the following claims against the Private Defendants:  assault and battery claims against Defendants Sagendorf, John Doe #4 ("Mike"), S&W Operating, and Fourth Wall; malicious prosecution claims against all of the Private Defendants; and negligent retention claims against S&W Operating and Fourth Wall.

The City Defendants and the Private Defendants have each collectively moved for summary judgment on all claims against them.  (Dkt. Nos. 88, 94.)

Plaintiff has moved for sanctions based on the alleged spoliation of evidence on the part of the Private Defendants and City Defendants Officers Cantwell, Musa, and Paquette.  (Dkt. No. 77.)  Both sets of defendants have opposed her motion.

For the reasons set forth below, the Court denies Plaintiff's motion for spoliation of evidence sanctions.  The Court denies summary judgment on Plaintiff's assault and battery and excessive use of force claims against City Defendant Officer Musa (both under state law and under § 1983) and Plaintiff's state law assault and battery claims against Private Defendants Sagendorf, S&W Operating, and Fourth Wall.  The Court dismisses the claims against John Doe Officers #1-3 and against John Doe #4.  The Court grants summary judgment to the defendants on all other claims.

I.      **Background**

A.      **Facts**[1]

The case before the Court stems from an altercation that occurred on the night of March 2-3, 2009 at Wollensky's Grill ("Wollensky's"), located at East 49th Street and Third Avenue, New York, New York.  (Complaint, Dkt. No. 1, ("Compl.") at 1.)  That evening, Plaintiff Jennifer Sachs was a patron of the bar at Wollensky's.  (Private Defendant's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, Dkt. No. 100, ("Private Defs. 56.1 Stmt.") ¶ 4.)  Defendant Smith & Wollensky Operating Corporation ("S&W Operating") owns Wollensky's and Defendant Fourth Wall Restaurants, LLC ("Fourth Wall") manages and employs those who work there.  Defendant Aaron Sagendorf was employed by Fourth Wall as a manager at Wollensky's and Defendant Patrick Ford was employed by Fourth Wall as a bartender at Wollensky's.  (*Id.* at ¶ 2-3.)

The exact relationship among Wollensky's, S&W Operating, Fourth Wall, and the Private Defendant employees is unclear from the record.  The Private Defendants contend that S&W Operating "does not employ or supervise" Sagendorf or Ford, and that they are employed only by Fourth Wall.  (*Id.* ¶ 1.)  However, there is no dispute that Fourth Wall is S&W Operating's agent for the purposes of running Wollensky's.

1.      **The Dispute Between Plaintiff and Defendant Ford**

Sachs arrived at the bar at about 12:30 a.m. on March 3, 2009.  While at the bar, Ford served Sachs one or two glasses of wine.  Sachs asserts that she had nothing else to drink that night besides the two glasses of wine.  (Declaration of Steve Stavridis in Support of Motion for

---

[1] The following facts are drawn from the parties' statements of undisputed facts and other submissions filed in connection with the motions for summary judgment.

Summary Judgment ("Stavridis Dec."), Ex. K, Deposition of Jennifer Sachs, Dkt. No. 92,

("Sachs Dep.") at 160.)  Sachs claims that the altercation began when Ford propositioned her,

and she refused.  (Compl. ¶¶ 24-26.)  Ford asserts that the altercation began when he cut her off

from further drinking.  (Affidavit of John Mulcahy in Support of Motion for Summary Judgment,

Dkt. No. 95 ("Mulcahy Aff."), Ex. F ("Ford Dep.") at 26.)  Neither side disputes that just before

1:30 a.m., Plaintiff angrily threw a glass water pitcher at Ford, which subsequently broke into

pieces behind the bar.[2]  (City Defendants' Statement of Undisputed Facts Pursuant to Local Civil

Rule 56.1, Dkt. No. 91, ("City Defs. 56.1 Stmt.") ¶¶ 10-11.)  Ford contends that the pitcher hit

him in the side of the head and bounced off, but Plaintiff disputes that the pitcher ever hit Ford.

(Ford Dep. at 26, 29; Plaintiff's Rule 56.1 Statement in Opposition to City of New York et al.

Motion to Dismiss, Dkt. No. 112, ("Pl. 56.1 Resp. - City Defs.") ¶¶ 10-11.)

The parties disagree sharply as to what happened next.

### 2.    The Dispute Between Plaintiff and Defendant Sagendorf

### a.    Plaintiff's Version

Plaintiff alleges that after throwing the pitcher, she walked to the door of Wollensky's

and opened it.  At that point, Sagendorf and a patron named "Mike"[3] grabbed her and pulled her

back inside the vestibule of the restaurant.  She claims that they then pushed, pulled, and

scratched her and slammed down her hand when she used her cell phone to dial 911.  Plaintiff

---

[2] In a later submission to the Court after the motions were fully briefed, Plaintiff denied for the first time that she threw a pitcher at all, and stated that "S&W doesn't even serve pitchers to its[] patrons."  (Dkt. No. 134 at 26.) However, the Court does not find this (unsworn) statement credible or supported by the evidence in the record.

[3] Plaintiff claims that "Mike" is the name of the bar patron who assaulted her, and believes that Wollensky's or its employees know who he is or have information that could help identify him.  Sagendorf asserts that he does not know the patron.  Plaintiff asserts that in the tape of her 911 call, she can hear Sagendorf shouting "Mike!  Mike! Stay on your knees!"  (Plaintiff's Memorandum in Support of Motion for Spoliation of Evidence, Dkt. No. 78 ("Pl. Spol. Mem."), Ex. L, Jennifer Sachs Affidavit.)

successfully dialed 911 shortly after 1:30 a.m.  Plaintiff claims that at that point either Sagendorf

or Mike knocked Plaintiff on the head, throwing her to the ground, where she blacked out.  At

around 1:34 a.m., Sachs alleges that she lay on the ground in the vestibule while Mike punched

her hand and shouted "you fucking Jew" at her.  (Compl. ¶ 32.)

### b.      The Private Defendants' Version

The Private Defendants present a very different description of the course of events.

Sagendorf asserts that after hearing the pitcher break, he turned to find Plaintiff raising her wine

glass as if to throw it at Ford.  (Stavridis Dec., Ex. M ("Sagendorf Dep."), at 33.)  Sagendorf

approached Plaintiff, asked her to leave, and held her by the shoulder to escort her to the

vestibule exit.  Sagendorf asserts that, once in the vestibule, Plaintiff began assaulting him by

striking him in the face with her open hand and kicking him in the groin.  (Sagendorf Dep. at 34-

38.)  To avoid being kicked, Sagendorf contends that he grabbed Plaintiff's kicking leg, at which

time Plaintiff fell to the ground.  Sagendorf then used his knee to pin her to the ground.  (*Id.* at

38-39.)

Police recordings show that at approximately 1:32 a.m., while on the ground being

pinned down by Sagendorf, Plaintiff called 911.  (Sagendorf Dep. at 39; City Defs. 56.1 Stmt. ¶

5.)  Sagendorf directed Ford also to call 911.  According to the police records, Ford's call came

in at 1:33 a.m.[4]   (City Defs. 56.1 Stmt. ¶ 5.)  Sagendorf asserts that after the call, he let Plaintiff

stand up, but that when she tried to kick him again, he again caught her leg, causing her to fall.

He pinned her down the final time by sitting on her legs.  (Sagendorf Dep. at 40.)  At that time,

---

[4] In a subsequent submission to the Court, Plaintiff goes to great lengths to argue that the 911 calls were made at slightly different times.  (*See* Dkt. No. 134.)  The Court does not find Plaintiff's arguments persuasive, and, in any event, the precise order and timing of the phone calls is not material to the Court's analysis of the viability of Plaintiff's claims in light of the evidence in the record.

Sagendorf says that a male patron entered the vestibule and helped him subdue Plaintiff by holding her wrists.  (*Id*. at 47-48, 62-63.)  Sagendorf admits that, in the course of restraining Plaintiff, he heard the patron call Sachs "a fucking Jew" more than once.  Sagendorf states that he told the patron to leave at that point.  (*Id.* at 92-94.)  Sagendorf restrained Plaintiff until the police arrived.

### 3.    The Dispute Between Plaintiff and the Defendant Police Officers

The parties agree that as a result of the 911 calls, at around 1:34 a.m., Officers Cantwell, Paquette and Musa received a radio dispatch reporting a dispute in progress at Wollensky's. (Stavridis Dec., Ex. N, Declaration of William Cantwell ("Cantwell Dec."), ¶ 4; City Defs. 56.1 Stmt. ¶ 5.)  Officer Cantwell arrived a minute or two before Officers Musa and Paquette, who arrived on the scene at approximately 1:35 a.m. (City Defs. 56.1 Stmt. ¶¶ 5, 7, 8; Stavridis Dec., Ex. N, Declaration of Alexandra Paquette ("Paquette Dec."), ¶ 5.)  Plaintiff's recollection of her interactions with the officers sharply differs from the account of the City Defendants.

### a.    Plaintiff's Version

Plaintiff alleges that around 1:35 a.m., Officer Cantwell and three other John Doe officers arrived and witnessed Mike beating her and calling her "a fucking Jew." (Compl. ¶ 33.) Plaintiff contends that these officers did not intervene or speak to her at all.  (*Id.*)  When officers Musa and Paquette arrived a minute later, Plaintiff contends that they saw Mike and Sagendorf still on top of her.  (Sachs Dep. at 147.)  Plaintiff claims that upon Officer Cantwell's order to "book her," Officer Musa handcuffed Plaintiff's already-injured hands and wrists.  (Compl. ¶¶ 34-36.)  Plaintiff alleges that Musa then took her outside Wollensky's, where she asked why she was being arrested.  Musa told her to "shut up" and kicked the back of her knee to the ground,

breaking her knee, and kicked her head.  Plaintiff claims that she then blacked out again.

(Compl. ¶¶ 37-38; Sachs Dep. at 153-157.)  She claims that when she regained consciousness at

around 2:00 a.m., she was being taken into the Bellevue Hospital emergency room.  (Compl. ¶

40; Sachs Dep. at 158-160.)

**b.**     **The Defendant Police Officers' Version**

In contrast, Officer Cantwell contends that when he arrived, he saw Plaintiff on the

ground being restrained by Sagendorf.  It is undisputed that Sagendorf informed Cantwell that

Plaintiff became rowdy after being cut off by the bartender and that he was trying to restrain her

because she had become violent.  (Sagendorf Dep. at 86; Cantwell Dec. ¶ 5.)  Officers Musa and

Paquette arrived moments later.  Cantwell spent about ten minutes interviewing Ford, Sagendorf,

and at least three patrons about the incident, and transferred his notes to Paquette.  (Cantwell

Dec. ¶ 7.)  Cantwell's interviews with the patrons substantiated the descriptions of the events

given by Ford and Sagendorf.  (Paquette Dec. ¶ 8.)  Cantwell then left the premises.

Officers Musa and Paquette both spoke with Plaintiff and determined based on her

belligerent demeanor and slurred speech that she was intoxicated.  (Paquette Dec. ¶ 9; Stavridis

Dec. Ex. N, Declaration of Joseph Musa ("Musa Dec."), ¶ 6.)  The officers spoke with Ford and

witnessed the broken glass from the pitcher.  They also spoke with Sagendorf and observed a red

mark on his face, which he stated was caused by Plaintiff's striking him.  (Paquette Dec. ¶¶ 6-7;

Musa Dec. ¶ 5.)  Plaintiff told the officers that the staff and patrons had attacked her and called

her a Jew.  (Musa Dec. ¶ 6; Paquette Dec. ¶ 9.)  The officers state that they observed no signs of

assault on Plaintiff except that she complained that her left hand hurt, and that they could not

ascertain a reason that the staff and patrons would have assaulted her.  (*Id.*)

7

At around 1:55 a.m., Defendants Musa and Paquette made the decision to arrest Plaintiff. (City Defs. 56.1 Stmt. ¶ 19.)  They placed her in handcuffs and escorted her to the police vehicle. Officers Musa and Paquette contend that, along the way, Plaintiff began screaming and kicking, making it necessary for each officer to restrain her by holding her arms on either side as they walked.  (Paquette Dec. ¶ 11; Musa Dec. ¶ 8.)  Officers Musa and Paquette assert that Plaintiff did not complain of tight handcuffs at any time.  (Musa Dec. ¶ 8.)  After placing Plaintiff in the vehicle, the two officers assert that Plaintiff attempted to kick out the rear windows.  (Musa Dec. ¶ 9; Paquette Dec. ¶ 12.)  Plaintiff was then transported to the police precinct for processing. (Paquette Dec. ¶ 12.)  When Plaintiff complained of pain in her left fingers, Paquette requested emergency medical services ("EMS") personnel to come to the precinct.  EMS then transported Plaintiff to Bellevue Hospital at about 2:34 a.m. (Paquette Dec. ¶¶ 13-14.)  After being dischargd from Bellevue Hospital at 4:30 a.m., Sachs was taken back to the precinct for arrest processing. (Paquette Dec. ¶ 15.)

### 4.    The Hospital Visits

It is undisputed that on the night of the incident, Sachs was transported to Bellevue Hospital, where she was examined and treated for swelling and abrasions on her left hand. (Compl. ¶ 40; Sachs Dep. at 158-160; Paquette Dec. ¶¶ 13-14; Stavridis Dec. Ex. H.)

The day after the incident, March 4, 2009, Sachs went to Lenox Hill Hospital, where she was treated for a fractured patella.  (Stavridis Dec., Ex. I.)  However, the City Defendants' purported medical expert examined Plaintiff's medical record and formed a different medical opinion.  Defendants' expert found that Sachs exhibited no signs of trauma to her kneecap and

that the x-rays in fact reflect that the problems with her patella were congenital.  (*See* Stavridis

Dec., Ex. J, Expert Report by Dr. Ramesh Gidumal.)

### B.     Procedural History

#### 1.     Criminal Court Action

On the same day as her arrest, March 3, 2009, Jennifer Sachs was arraigned in New York

City Criminal Court and charged with assault in the third degree and disorderly conduct.

(Private Defs. 56.1 Stmt. ¶ 6.)  Two days after the incident, Sagendorf went to the District

Attorney's office, where he read the complaint and signed a supporting deposition.  (Defendants'

Memorandum in Opposition to Motion for Spoliation of Evidence, Dkt. No. 81 ("Private Defs.

Spol. Opp."), Ex. G.)

Both charges against Plaintiff were dismissed on August 24, 2009 pursuant to New York

Criminal Procedure Law § 30.30, which mandates that the prosecutor be ready for trial in a class

A misdemeanor case within 90 days of the commencement of the action.  (Private Defs. 56.1

Stmt. ¶ 7)

#### 2.     State Court Action

On March 10, 2009, Plaintiff filed in New York State Supreme Court a Request for

Judicial Intervention, seeking an Order to show cause to obtain pre-action discovery.

Specifically, she sought an order directing Respondents Smith & Wollensky

Restaurant/Wollensky's Grill and The Smith & Wollensky Restaurant Group, Inc. to "produce

for inspection and copying any and all surveillance tapes and/or video tapes prepared in the

regular course of business regarding the events" of the night of March 2-3 "in order to preserve

evidence, to prevent spoliation, and in order to identify the appropriate individuals in order that

petitioner might be able to prepare a proper caption in the event of litigation herein." (Pl. Spol. Mem., Ex. B.) The court issued an order to show cause why it should not order the respondents to produce these materials. (*Id*., Ex. A.) Sometime thereafter (although the record is not clear when) an attorney for the respondents submitted an affirmation in response to the order to show cause stating that "[t]he respondent has no opposition to the order sought by the petitioner regarding the preservation of any video from the security surveillance cameras . . . assuming that any such video was in fact recorded on the day and at the time of the incident in question and, if any, was maintained as of March 17, 2009, the date that the Order to Show Cause was served upon the respondent." (*Id.*, Ex. C.)

The court entered an order "on default" on July 16, 2009. (*Id*., Ex. F.) That order provided that the respondents should preserve "any and all surveillance tapes and/or videotapes" pertaining to the incident, as well as "any and all accident, incident reports, or other records identifying the individuals involved in the assault . . . and any witnesses thereto . . . ." (*Id*.) On July 28, 2009, the parties entered into a stipulation stating that Smith & Wollensky Restaurant Group, Inc. would respond to the order within thirty days of the stipulation, and "as to those items where respondent is unable to comply, [would] submit an affidavit from an individual with knowledge to that effect." (*Id.*, Ex. H.)

Sometime after September 2, 2009, the respondents submitted a "Response" to the Supreme Court's order, stating, *inter alia*: "INCIDENT REPORT – There is no report prepared in the ordinary course of business . . . regarding the incident involving Jennifer Sachs." (Private Defs. Spol. Opp., Ex. K.) Sagendorf also submitted an affidavit stating that an electrical problem on the evening of March 2-3, 2009 rendered the security cameras inoperative, and that no video

10

footage of the incident was available.  He also described in general terms the patrons of Wollensky's that evening, but stated that the respondents "do[] not have any record which would reveal their names or addresses."  (*Id.*, Ex. L.)

### 3.    Current Action

Plaintiff filed the instant lawsuit on March 2, 2010, bringing various claims against the City Defendants and the Private Defendants related to the March 3, 2009 incident.  The case was initially assigned to Judge Richard Sullivan.  Pursuant to Judge Sullivan's August 17, 2011 Order, discovery in this matter closed on October 28, 2011.  (*See* Dkt. No. 60.)  On October 14, 2011, the case was reassigned to the undersigned pursuant to this District's Rules for the Division of Business Among District Judges governing the reassignment of cases to new district judges.  (Dkt. No. 68.)

On November 28, 2011, Plaintiff moved for spoliation of evidence sanctions against the Private Defendants and Officers Cantwell, Musa, and Paquette.  (Dkt. No. 77.)  On December 16, 2011, the Private Defendants opposed Plaintiff's motion for spoliation of evidence sanctions. (Dkt. No. 81.)

The Private Defendants moved for summary judgment on all four claims against them on January 11, 2012.  (Dkt. No. 94.)

The City Defendants moved for summary judgment on all six claims against them on January 9, 2012 (Dkt. No. 88), and filed their opposition to Plaintiff's motion for spoliation of evidence sanctions on January 11, 2012 (Dkt. No. 98).

After the instant motions were fully briefed, Plaintiff's attorney moved to withdraw as counsel.  The Court granted that motion on July 12, 2012.  (Dkt. No. 128.)

Proceeding *pro se*, Plaintiff contacted the Court and requested permission to submit additional documents and evidence that she was not able to submit in connection with the motions due to what she claimed were conflicts between her and her attorney.  In an effort to ensure that the Court's decision was based on as complete a record as possible, the Court granted Plaintiff permission to submit this material.  On August 1, 2012, Plaintiff submitted a variety of addenda to her submissions in connection with the motion, including unsworn addenda to her Rule 56.1 statements that did not contain references to any evidence in the record.  She raised new allegations for the first time in these submissions, including, for example, that she did not throw a glass pitcher at Ford, because Wollensky's does not serve pitchers to its patrons.

The Court does not find that Plaintiff's new allegations are credible or are supported by the record.  In addition, the new argumentation and unsworn testimony go beyond the additional "documents and evidence" that the Court granted Plaintiff permission to file.  (Dkt. No. 128.)  In any event, the Court has reviewed the Plaintiff's additional submission and has considered it for what it is worth on these motions.

## II.   Motion for Spoliation Sanctions

Plaintiff has moved for spoliation sanctions against Private Defendants S&W Operating, Fourth Wall, Sagendorf, and Ford for destroying receipts, invoices, reservation logs, and surveillance videotapes; and against City Defendants Officers Cantwell, Musa, and Paquette for failing to secure the surveillance videotape at the scene.  Plaintiff requests that the Court strike any and all claims or defenses that would have been resolved by the destroyed evidence, deny summary judgment as to any and all claims that would be affected by the existence of the tapes as to the Private Defendants and the City Defendants, include an adverse inference jury

instruction, assess attorney's fees, expenses, and costs, and order a default judgment against the Private Defendants, along with any other relief the Court may deem proper.

### A.    Applicable Law

A federal district court may sanction a party for spoliation of evidence in violation of a court order under Fed. R. Civ. P. 37(b). *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988). Even absent violation of a court order, a district court may sanction a party for spoliation of evidence in the exercise of the court's "inherent power to control litigation." *West*, 167 F.3d at 779.

Whether the court sanctions a party for violation of a court order or as part of its inherent power to control litigation, a party seeking sanctions for the spoliation of evidence must establish three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Zubulake v. UBS Warbug LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (citations omitted). The obligation to preserve evidence arises "where a party is on notice that litigation is likely to be commenced." *Rutgerswerke AG & Frendo S.p.A. v. Abex Corp.*, No. 93 Civ. 2914, 2002 WL 1203836, at *13 (S.D.N.Y. June 4, 2002) (citation and quotation marks omitted). A defendant destroys evidence with a culpable state of mind when the defendant destroys it negligently, intentionally, or willfully. *Zubulake*, 229 F.R.D. at 431. When the destruction is negligent, the defendant must prove that the evidence was relevant and favorable to the party seeking the sanctions. *Id.* In

13

contrast, when evidence is destroyed intentionally or willfully, that fact alone is sufficient to demonstrate relevance and favorability.  *Id.* at 430-31.

Additionally, "for sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed.*"  *Farella v. City of New York*, No. 05 Civ. 5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007).  Although there is not a well-established standard of proof for a finding that the "destroyed evidence" existed, courts routinely have declined to infer that evidence existed when presented with only circumstantial supporting evidence.  Specifically with regard to video recordings, courts have found that the mere presence of a video camera does not establish that the camera was in place to record at the time, nor does its presence establish that any recording was made at the time of the incident.  *See Mohammed v. Delta Air Lines, Inc.*, No. 08 Civ. 1405, 2011 WL 5553827, at *7 (E.D.N.Y. June 8, 2011); *United States v. Perez–Velazquez,* 488 F. Supp. 2d 82, 85 (D.P.R. 2007) ("[T]here has been no spoliation of evidence, as there is no proof that the surveillance camera found in Pérez' apartment was connected to a recording device."); *Kreyn v. Gateway Target¸* No. CV-05-3175, 2006 WL 3732463, at *2 (E.D.N.Y. Dec. 17, 2006) ("As to the videotapes, the defendant flatly asserts that the stationery aisle of the defendant's premises [was] not videotaped on the day of the accident. . . . The testimony by one of the defendant's employees that there are videotape cameras throughout the store does not establish that there was a videotape camera at the stationery aisle and that it was operating at the time of the accident such that a videotape was ever made, much less destroyed.").

**B.       Application of Law to Facts**

     **1.       The Private Defendants**

Plaintiff argues that Private Defendants S&W Operating, Fourth Wall, Sagendorf and

Ford (1) destroyed or lost material evidence, specifically video surveillance tapes, as well as

credit card receipts, invoices, and reservation logs that may help identify witnesses to the

incident, and (2) did so in violation of a state court order to preserve the evidence.

Plaintiff's argument refers to the New York Supreme Court order issued on July 16, 2009

by Justice Richard Braun.[5]  The order, issued to respondents Smith & Wollensky Restaurant and

The Smith & Wollensky Restaurant Group, Inc., provided that the respondents should preserve

"all surveillance tapes and/or videotapes" pertaining to the incident as well as "any accident,

incident reports, or other records identifying the individuals involved in the assault . . . and any

witnesses thereto . . . ."  (Pl. Spol. Mem., Ex. F.)

     **a.       The Video Surveillance Tape**

Plaintiff argues that the Private Defendants were once in possession of a video

surveillance tape of the altercation in the vestibule and intentionally destroyed it.  Plaintiff

contends that, if produced, the tape would have corroborated her version of the events.  As

evidence of its existence, Plaintiff submits a handwritten note by police at the scene that there

was "video available."  (*Id.*, Ex. M.)  Plaintiff also submits an unsworn letter from one of her

---

[5] Plaintiff asserts that the state court entered "a default judgment" against the defendants in the state court action. (Pl. Spol. Mem. at 2.)  Plaintiff's characterization of the state court action is inaccurate.  The state court entered its order to preserve evidence on default because Defendants did not show cause as to why the Court should not enter the order.  (Pl. Spol. Mem., Ex. F.)

lawyers stating that she visited Wollensky's after the incident and saw a video camera pointing at the vestibule, where some of the events took place.  (*Id*., Ex. E.)

For their part, the Private Defendants submit evidence that a power failure prevented their surveillance system from making any recordings during the time of the altercation.  In a sworn affidavit, Sagendorf explains that "[t]here was a loss of power or a 'brownout' in the Grill during the evening of March 2, 2009.  I became aware of this event because the lights dimmed and then returned to normal.  Later, I saw ConEd workers working in the street nearby.  Unbeknownst to me, the server for the surveillance cameras shut down in the brownout and did not reboot until our technology manager arrived for work the next morning."  (Private Defs. Spol. Opp., Ex. C ¶¶ 10-11.)  The Private Defendants also submit sworn statements from the Technology Manager for Fourth Wall that the cameras were non-functional and did not record any tape from approximately 11:30 p.m. on March 2, 2009 to 8:30 a.m. on March 3, 2009.  (*Id*., Ex. B.)  This testimony is accompanied by corroborating print-outs from the surveillance system's server activity logs.  (*Id*., Ex. B1-B2.)  Additionally, Sagendorf testifies that had the surveillance system been operational, no video would have been made of the incident, as "both cameras were aimed at the bar and the area behind the bar."  (*Id*., Exhibit C, ¶ 8.)

Plaintiff asks the Court to reject the Private Defendants' "power failure" explanation on the ground that it is incredible.[6]  However, the Private Defendants have submitted sworn

---

[6] As part of this theory, Plaintiff claims that Sagendorf admitted in his deposition that there was "a 'backup' system in place for the recorder should a catastrophe occur."  (Pl. Spol. Mem. at 5.)  Plaintiff mischaracterizes Sagendorf's testimony.  The exchange during the deposition went as follows:

     Q:  "So, what type of camera is it?"
     A:  "Video camera."
     Q:  "With tape or -- "
     A:  "I believe they have DVD hard drive backup."

testimony and evidence to support that testimony, while Plaintiff has submitted no evidence that would call the defendants' explanation into question.  First, the fact that a camera might currently point at the vestibule of Wollensky's, per Plaintiff's lawyer's observations, does not mandate a conclusion that the camera was present at the time of the incident.  Second, even assuming that a camera was pointed toward the vestibule at the time of the incident, Plaintiff has not presented evidence that the camera was attached to a functioning recording device or that a recording was actually created.  Based on the evidence before it, the Court cannot infer that a surveillance video ever existed, let alone was destroyed.

Accordingly, because Plaintiff has not established that the tape existed, the Court denies Plaintiff's motion for spoliation sanctions for destruction of a video surveillance tape.

### b.      The Paper Evidence

Plaintiff also moves for spoliation sanctions pertaining to certain paper evidence, specifically credit card receipts from the night of March 2-3, 2009 and other documents that may have helped to identify third party witnesses to the incident.

The Court was initially not satisfied with the Private Defendants' response to the motion for sanctions with regard to this evidence.  Accordingly, the Court convened telephone conferences with the parties on August 7 and 15, 2012, to address whether the receipts for that

---

(Private Defs. Spol. Opp., Ex. N, at 56.)  Defendants explain that "[i]n other words, Sagendorf said he believed that images were recorded (when the recording system was in operation) on a 'DVD hard drive back-up.'  He said nothing about a 'backup system' that existed in case 'a catastrophe should occur.'"  (Private Defs. Spol. Opp. at 7.)  Roger McDyer, the technology manager, confirms that there was no separate back-up system.  (*Id.*, Ex. B.)  This explanation is consistent with a plain reading of Sagendorf's deposition testimony.

Plaintiff also points out that Defendants have submitted testimony and evidence that is contradictory in other minor respects.  It is true that at various points, Defendants have asserted that video surveillance tape is generally kept for one versus two weeks or described the electrical failure as a "brown out" or "power surge."  Defendants have also asserted that there was no camera pointed toward the vestibule, which is contrary to Plaintiff's lawyer's direct observations.  These contradictions do not, however, prove that there was in fact a camera pointed toward the vestibule that evening, nor do the contradictions prove that a functioning recording device was hooked up to the camera.

17

evening ever existed, and if so, whether they had been produced, or were destroyed or otherwise unavailable.

At the telephone conference on August 15, 2012, counsel for the Private Defendants stated that she had located the credit card receipts from March 2 and 3, 2009 and had produced them to Plaintiff.  Plaintiff stated that the receipts did not identify any witnesses to the incident that she did not already know about.

Thus, although the severely late production of this evidence is not excusable, Plaintiff was not harmed by it.

Accordingly, sanctions for spoliation of evidence are not appropriate with regard to this evidence.

### 2.    The City Defendants

Plaintiff has moved for spoliation sanctions against City Defendants Officer Cantwell, Officer Musa, and Officer Paquette, arguing that they were alerted to the existence of the surveillance tapes while at the scene, and then intentionally or negligently violated their duty to view and/or to secure the security tape.  The City Defendants oppose Plaintiff's motion.

Because Plaintiff has not demonstrated that this evidence ever existed in the first instance, the City Defendants could not have had an obligation to view the tape or secure it.  In any event, even assuming the tape existed, spoliation sanctions are applicable only when a party loses or destroys evidence, not when he or she fails to collect it.  *Carroll v. City of New York*, 287 A.D.2d 430, 730 N.Y.S.2d 548, 550 (2d Dep't 2001) (stating that police's alleged failure to collect evidence at the scene of an accident could not be the basis for spoliation sanctions).

Therefore, the Court denies Plaintiff's motion for spoliation sanctions against the City

Defendants.

### III.   Summary Judgment Standard

A motion for summary judgment may not be granted unless all of the submissions taken

together show "that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see El Sayed v. Hilton Hotels Corp.*, 627

F.3d 931, 933 (2d Cir. 2010).  "The moving party bears the burden of establishing the absence of

any genuine issue of material fact."  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336,

340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  The movant may

discharge this burden by demonstrating to the Court that there is an absence of evidence to

support the non-moving party's case on an issue on which the non-movant has the burden of

proof.  *Celotex*, 477 U.S. at 323.  In opposing a motion for summary judgment, the non-moving

party may not rely on "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*,

143 F.3d 105, 114 (2d Cir. 1998), or on mere denials or unsupported alternative explanations of

its conduct.  *See SEC v. Grotto*, No. 05 Civ. 5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24,

2006).  Rather, the non-moving party must set forth significant, probative evidence on which a

reasonable fact-finder could decide in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256-57 (1986).

In deciding a motion for summary judgment, a court must "construe the facts in the light

most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation

and quotation marks omitted).  "If, as to the issue on which summary judgment is sought, there is

any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

## IV.   City Defendants' Motion for Summary Judgment

Plaintiff asserts claims against the City Defendants under both state law and the Constitution.  The standards for establishing Plaintiff's state law claims against the City Defendants significantly overlap with the standards for establishing the equivalent claims as constitutional violations under Section 1983.  *See, e.g.*, *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) ("In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred."); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." (internal citations omitted)); *Cunningham v. United States*, 472 F. Supp. 2d 366, 383 (E.D.N.Y. 2007) ("Once it has been determined that there was probable cause for arrest, the question [whether a police officer can be liable for assault and battery in the course of effecting an arrest] becomes whether the force used to effectuate the arrest was excessive." (citation omitted)).  Thus, the Court analyzes both sets of claims simultaneously, noting where there are any differences between the two types of claims.

### A.   Claims Against John Does #1-3

The Court dismisses John Doe Police Officers #1-3 from the case without prejudice for failure to prosecute, as Plaintiff did not identify the John Doe Defendants by the end of

discovery.  "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice."  *Delrosario v. City of New York*, No. 07 Civ. 2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (citing *Coward v. Town and Village of Harrison*, 665 F. Supp. 2d 281, 300-01 (S.D.N.Y. 2009); *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 536 n. 3 (S.D.N.Y. 2005)).

### B.    False Arrest Claim

Plaintiff brings both state law and constitutional claims for false arrest against Officers Cantwell and Musa.  Cantwell and Musa move for summary judgment.

### 1.    Applicable Law

To succeed on a false arrest claim, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003) (citation and quotation marks omitted).  Whether a claim is brought under New York law or § 1983, "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest . . . ."  *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999) (quoting *Weyant*, 101 F.3d at 852).

Probable cause "is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest."  *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  An officer has probable cause to arrest when he or she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief

that the person to be arrested has committed or is committing a crime." *Id.* at 152 (quoting

*Weyant*, 101 F.3d at 852); *see also United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987).

The Second Circuit has held that it is "well-established" that a law enforcement officer has

probable cause to arrest if he has "received his information from some person, normally the

putative victim or eyewitness." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation

and quotation marks omitted); *accord Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

     The refusal of police officers to investigate exculpatory statements made by the arrestee

before arresting that person based on probable cause does not defeat probable cause to arrest.

*See id.* at 395-96; *see also Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991); *Dukes v.

City of New York*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995); *Grant v. City of New York*, 848 F.

Supp. 1131, 1135 (S.D.N.Y. 1994); *Steiner v. City of New York*, 920 F. Supp. 333, 338

(E.D.N.Y. 1996).  The function of law enforcement officers is to "apprehend those suspected of

wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Crowley*,

460 F.3d at 396 (quoting *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989)) (internal

quotation marks omitted).  Police officers who have probable cause to arrest "have no duty to

investigate an exculpatory statement of the accused," nor are they "required to adjudicate

disputed issues of fact on the spot." *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y.

1998).  If probable cause exists, a police officer is "not required to explore and eliminate every

theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit

Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46

(1979)).

### 2.      Application of Law to Facts

Under New York Penal Law, a person is guilty of assault in the third degree when "[w]ith intent to cause physical injury to another person, [s]he causes such injury to such person or to a third person . . . ."  N.Y. Penal Law § 120.00(1).  A person is guilty of disorderly conduct when, "with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof . . . [sh]e engages in fighting or in violent, tumultuous or threating behavior . . . ."  N.Y. Penal Law § 240.20(1).

The following facts are undisputed:  (1) Ford told the officers that Plaintiff had hit his head with a glass pitcher after he cut her off and Plaintiff had assaulted Sagendorf by kicking him and slapping him; (2) Sagendorf told the officers that Plaintiff had slapped and kicked him; (3) Officer Cantwell confirmed the reports of the employees by interviewing patrons who backed up the employees' version of the events; (4) Officers Musa and Paquette witnessed the broken glass on the bar floor from the broken water pitcher; (5) Officers Musa and Paquette directly observed the red mark on Sagendorf's face, which Sagendorf indicated was a result of Plaintiff's slapping him; and (6) Plaintiff's speech was slurred in the presence of the officers.

Taken together, these facts were sufficient to establish beyond genuine dispute probable cause to believe that Plaintiff had committed the crimes of assault and disorderly conduct.  The officers received testimony from purported victims of Plaintiff's alleged conduct.  The officers then corroborated those statements by interviewing other witnesses and investigating the physical evidence at the scene.

Plaintiff argues that the police officers did not have probable cause because when they arrived, Plaintiff was being beaten by Sagendorf and "Mike."  (Sachs Dep. at 147.)  Even

construing the facts in the light most favorable to the plaintiff, and assuming *arguendo* that the police officers did observe Mike and Sagendorf punching Plaintiff,[7] there was still probable cause to arrest her.  At most, seeing Mike and Sagendorf beating Plaintiff may have provided the officers with probable cause to arrest Mike and Sagendorf as well.  However, probable cause to arrest other people involved in the dispute does not undermine the probable cause to arrest Plaintiff, where, as here, probable cause to arrest is independently supported.  Once an officer has probable cause to arrest a person suspected of wrongdoing, the officer is not required to explore "every theoretically plausible claim of innocence before making [the] arrest." *Ricciuti*, 124 F.3d at 129.

Because a finding of probable cause for arrest is a complete bar to a false arrest claim, the Court grants summary judgment for the City Defendants on Plaintiff's false arrest claim.[8]

### B.    Malicious Prosecution Claim

Plaintiff alleges that Officer Cantwell, Officer Paquette and Officer Musa are liable for malicious prosecution under state law and § 1983.  The City Defendants move for summary judgment dismissing these claims.

---

[7] Although Plaintiff alleges in her complaint that Cantwell observed Mike actually punching Plaintiff and yelling at her, she does not put any evidence in the record to support this allegation.  (*See* Compl. ¶¶ 32-33.)

[8] Defendants also argue that Officers Musa and Paquette are entitled to qualified immunity because they can show "arguable probable cause."  "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Martinez*, 202 F.3d at 634; *see also Robison v. Via*, 821 F.2d 913, 921 (2d. Cir. 1987) (holding that qualified immunity is warranted if officers of reasonable competence could disagree on whether the probable cause test was met).  Because the Court has found that the officers arresting Plaintiff had objective probable cause, *a fortiori*, the officers also had "arguable probable cause," and are entitled to qualified immunity on this claim.

### 1.      Applicable Law

To succeed on a malicious prosecution claim, a plaintiff must show:  "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor."  *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (citation and quotation marks omitted); *see also DiBlasio v City of New York*, 102 F.3d 654, 657 (2d Cir. 1996) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)).  "In order to allege a cause of action for malicious prosecution under § 1983, [Plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  *Rohman*, 215 F.3d at 215 (citing *Murphy v. Lynn,* 118 F.3d 938, 944-46 (2d Cir. 1997)).

"Once probable cause to arrest is established, a claim for malicious prosecution is barred unless plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to light that negated probable cause."  *Smith v. City of New York*, No. 04 Civ. 3286, 2010 WL 3397683, at *9 (S.D.N.Y. Aug. 27, 2010) (citation and quotation marks omitted).  The Second Circuit has noted that "even when probable cause is present at the time of the arrest, evidence could later surface which would eliminate that probable cause."  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (citation and quotation marks omitted).  Probable cause dissipates when "the groundless nature of the charges [are] made apparent by the discovery of some intervening fact."  *Id.*

### 2.   Application of Law to Facts

There is no dispute that the City Defendants initiated a prosecution against Plaintiff, or that the prosecution was terminated in her favor.  Nevertheless, the Court grants summary judgment because the Defendant Police Officers had probable cause to arrest Plaintiff for the crimes charged and Plaintiff has not pointed to an intervening fact that would make the allegedly groundless nature of the assault and disorderly conduct charges apparent.  Because Plaintiff's claim fails on this prong, the Court need not address whether the City Defendants acted with malice or whether there was a sufficient post-arraignment liberty restraint.

Plaintiff argues that the officers should have been alerted to the groundless nature of the assault and disorderly conduct charges when hospital staff noted that Plaintiff appeared alert, not intoxicated.  However, probable cause to charge a person with assault or disorderly conduct does not turn on whether the prosecuted person was sober or intoxicated at the time of his or her arrest.  *See* N.Y. Penal Law §§ 120.00, 240.20.  Thus, Plaintiff's alleged sobriety at the time of the incident does not undermine the probable cause to arrest her, nor does it reveal that the charges of assault and disorderly conduct were groundless.  The officers still had probable cause to prosecute Plaintiff based on the statements made by alleged victims Ford and Sagendorf and the evidence observed at the scene.  One of the alleged victims, Sagendorf, also submitted a supporting deposition after Plaintiff was arraigned on the charges.  (City Defs. 56.1 Stmt. ¶ 23.) Because there is no evidence of an intervening fact that would make the charges groundless, the Court concludes that there is no genuine issue as to the Defendant Police Officers' probable cause to prosecute Plaintiff for the alleged crimes.  Accordingly, the Court grants the City Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim.

### C.        Assault and Battery / Excessive Force Claims

Plaintiff asserts claims for assault and battery against Officer Musa based on his alleged use of excessive force in arresting Plaintiff by kicking her knee, breaking her knee, throwing her to the ground, and kicking her head.  Plaintiff also alleges a "tight handcuffs" claim of excessive use of force against Officer Musa.  The City Defendants move for summary judgment on these claims.

### 1.        Applicable Law

Under New York law, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact.  A 'battery' is an intentional wrongful physical contact with another person without consent."  *United Nat'l Ins. Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993).  "Under New York Penal Law § 35.30, an officer 'may use physical force when and to the extent [she or] he reasonably believes such to be necessary to effect the arrest.'"  *Lederman v. Adams*, 45 F. Supp. 2d 259, 268 (S.D.N.Y. 1999).  Thus, "[o]nce it has been determined that there was probable cause for arrest, the question before the court becomes whether the force used to effectuate the arrest was excessive."  *Cunningham*, 472 F. Supp. 2d at 383 (citations omitted).  "If the force used against plaintiff was more than necessary under all the circumstances, then plaintiff is entitled to recover."  *Id.* (citations omitted).

Plaintiff also alleges that her Fourth Amendment rights were violated by Officer Musa's excessive use of force in effecting her arrest.  "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest."  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).  "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has

instructed that courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.'"  *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  In evaluating reasonableness, the court is to "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest."  *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (citing *Graham*, 490 U.S. at 396).  "Additionally, on an excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable."  *Washpon v. Parr*, 561 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) (citation and quotation marks omitted).  "A *de minimis* use of force will rarely suffice to state a Constitutional claim."  *Id.* at 407 (quoting *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993)).

Courts apply a separate standard to claims for excessive force in the use of handcuffs. While handcuffs must be reasonably tight to be effective, handcuffs that are overly tight may constitute an excessive use of force on the part of the officer using them.  *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).  "[I]n evaluating the reasonableness of handcuffing, a court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff s] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*."  *Id.* (quoting *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)) (emphasis in original).  The last factor is particularly important.  While the application of tight handcuffs alone can give rise to a cause of action under

§ 1983, "the plaintiffs must suffer some form of injury from the tight handcuffs in order for such

a claim to be actionable." *Vogeler v. Colbath*, No. 04 Civ. 6071, 2005 WL 2482549, at *9

(S.D.N.Y. Oct. 6, 2005) (citing *Simpson v. Saroff*, 741 F.Supp. 1073, 1078 (S.D.N.Y. 1990)

(excessive force claim proper when tight handcuffing lead to bloody wrist and scarring)).

Among courts in this circuit, there is "consensus" that "tight handcuffing does not constitute

excessive force unless it causes some injury beyond temporary discomfort." *Lynch*, 567 F. Supp.

2d at 468-69 (citing *inter alia Bratton v. New York State Div. of Parole*, No. 05 Civ. 950, 2008

WL 1766744, at *9-10 (N.D.N.Y. Apr. 14, 2008) (concluding that the plaintiff did not meet the

injury requirement even though the plaintiff had submitted county jail medical records showing

he experienced swelling and bruising of the wrists lasting three weeks as a result of

handcuffing); *Hamlett v. Town of Greenburgh*, No. 05 Civ. 3215, 2007 WL 119291, at *3

(S.D.N.Y. Jan. 17, 2007) (concluding that "brief numbness" resulting from handcuffing does not

meet the injury requirement); *Golio v. City of White Plains*, 459 F. Supp. 2d 259, 265 (S.D.N.Y.

2006) (denying summary judgment to defendants because plaintiff alleged swelling apparent to

the naked eye and lasting nerve damage as a result of the cuffing); *Vogeler*, 2005 WL 2482549,

at *9-10 (dismissing claim where plaintiffs failed to establish "any measurable harm" from the

handcuffing); *Wilder v. Vill. of Amityville*, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003)

("Plaintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of objective

excess that reasonable police officers would consider to be unlawful conduct in an arrest

situation.  Plaintiff's claim of excessive force fails.")).

### 2.      Application of Law to Facts

#### a.      Excessive Force in Performing the Arrest

It is apparent from the record that there are genuine issues of material fact precluding summary judgment on Plaintiff's excessive force claim.  Plaintiff alleges that she was not resisting arrest, and that Officer Musa "kicked the back of her knee, breaking it, and then threw her to the ground and kicked her head."  (Compl. ¶ 116.)  Plaintiff also submits hospital records for treatment of injuries she allegedly suffered during the incident.

The City Defendants submit testimony that Plaintiff violently resisted arrest, and Officers Musa and Paquette deny that either of them, at any time, struck, kicked, or punched Plaintiff. They also argue that the hospital records contain contradictions, and submit a purported expert report stating that the knee treatment was a result of a congenital defect, and not due to the injury.  Finally, the City Defendants argue that Plaintiff has contradicted herself in her allegations and testimony, pointing out that in an affidavit filed in connection with the state court action to preserve evidence, Plaintiff appeared to suggest that her knee injuries were caused by the alleged assault by Sagendorf and "Mike."  (*See* Stavridis Dec., Ex. O.)

The Court finds that the potential inconsistencies in the medical records are insufficient to eliminate any genuine issue of fact as to whether Plaintiff was seriously injured as a result of Officer Musa's actions during her arrest.  In addition, although Plaintiff's affidavit in the state action states that she was assaulted by a patron and employee of Wollensky's, and that she was injured "[a]s a result of this occurrence," this statement is not inconsistent with her contention that she was also injured by Officer Musa.

Ultimately there is a dearth of evidence in the record that would conclusively establish exactly how much force was used and whether that force was objectively reasonable.  The ultimate determination will depend in large part on the credibility of the witnesses.  However, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citing *Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir.1996)).

### b.      Excessive Force in Handcuffing

Even if the Court accepts for purposes of this motion that Plaintiff's handcuffs were unreasonably tight, Plaintiff cannot succeed on her claim because she has not alleged or shown that she suffered some sort of injury as a result of the handcuffing.  Plaintiff avers the tightness of the handcuffs caused swelling of her wrists so that her wrists remained swollen twenty-four hours later.  (Sachs Dep. at 167.)  Nonetheless, Plaintiff does not show that she sought medical attention for the injury to her wrists any time after the incident, even though she was taken by EMS to Bellevue Hospital the night of the incident, and visited Lenox Hill Hospital for knee pain the day after.  (*See* Declaration of Scott Turner in Opposition to City of NY's Motion to Dismiss, Dkt. No. 107, Exs. 1-2.)  Twenty-four hour swelling of the wrists does not rise to the level of injury necessary to sustain an excessive use of force claim for tight handcuffs.  Thus, the Court grants summary judgment to Defendant Musa on Plaintiff's tight handcuffs claim against him.

### D.      "Failure to Train" *Monell* Claim

Plaintiff asserts a municipal liability claim against the City of New York under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), and 42 U.S.C. § 1983.  Plaintiff alleges that the City of New York maintained "customs, policies, and practices regarding the

supervision and/or training of NYPD officers that led to deprivations of Plaintiff's rights under

the . . . United States Constitution."  (Compl. ¶ 165.)

### 1.      Applicable Law

To bring a general *Monell* claim, "[t]he plaintiff must first prove the existence of a

municipal policy or custom in order to show that the municipality took some action that caused

his injuries beyond merely employing the misbehaving officer.  Second, the plaintiff must

establish a causal connection—an 'affirmative link'—between the policy and the deprivation of

his constitutional rights."  *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)

(citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 824 n.8 (1985) (plurality opinion)).  "In other

words, a municipality may not be found liable simply because one of its employees committed a

tort."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Bd. of County Comm'rs v.

Brown*, 520 U.S. 397, 405 (1997)).

A plaintiff may also bring a municipal liability claim under *Monell* where a government's

failure to adequately train and supervise employees results in a constitutional violation and

reflects a "deliberate indifference" to the constitutional rights of those with whom the employees

will come into contact.  *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Walker v. City of

New York*, 974 F.2d 293, 297-98 (2d Cir. 1992); *Richardson v. City of New York*, No. 04 Civ.

05314, 2006 WL 3771115, at *5 (S.D.N.Y. Dec. 21, 2006).

There are four requirements that a plaintiff must meet in order to survive summary

judgment on a failure to train *Monell* claim.  "First, the plaintiff must show that a policymaker

knows 'to a moral certainty' that her employees will confront a given situation. . . .  Second, the

plaintiff must show that the situation either presents the employee with a difficult choice of the

sort that training or supervision will make less difficult or that there is a history of employees

mishandling the situation. . . .  [Third], the plaintiff must show that the wrong choice by the city

employee will frequently cause the deprivation of a citizen's constitutional rights."  *Walker*, 974

F.2d at 297-98; *see also Richardson*, 2006 WL 3771115, at *5.  Finally, "at the summary

judgment stage, plaintiffs must identify a specific deficiency in the city's training program and

establish that that deficiency is closely related to the ultimate injury, such that it actually caused

the constitutional deprivation."  *Id.* at *5 (citation and internal quotation marks omitted).

### 2.    Application of Law to Facts

Plaintiff's *Monell* claim fails as a matter of law.  While Plaintiff has alleged in her

complaint in general terms that the City of New York maintained policies or customs that led to

the deprivation of her civil and constitutional rights, Plaintiff has not put into the record any

evidence to support her claim.  As the City Defendants point out, Plaintiff has not identified

specifically the custom, policy, or practice that led to the deprivation of her civil rights, nor has

she adduced any evidence to establish a link between a policy or practice and the alleged

deprivation of her civil or constitutional rights.  Furthermore, Plaintiff has not offered any

evidence as to any of the prongs of her more specific failure to train claim.  Accordingly, the

Court grants summary judgment to the City of New York on Plaintiff's *Monell* claim.

## V.    Private Defendants' Motion for Summary Judgment

### A.    Plaintiff's Claims Against John Doe #4 ("Mike")

Plaintiff has brought malicious prosecution, assault, and battery claims against John Doe

#4, to whom the parties refer as "Mike."  However, "Mike" has never been positively identified

or served.  Accordingly, the Court dismisses without prejudice Plaintiff's claims against John

Doe #4 for the same reasons that it has dismissed Plaintiff's claims against John Doe Officers #1-3.

### B.     Assault and Battery Claims

The Private Defendants have moved for summary judgment on Plaintiff's assault and battery claims against Defendant Sagendorf and against Defedants S&W Operating and Fourth Wall vicariously.

### 1.     Plaintiff's Claims Against Sagendorf

As explained previously, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact.  A 'battery' is an intentional wrongful physical contact with another person without consent."   *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993).

There is ample evidence in the record demonstrating that there are genuine disputes of material fact as to precisely what happened at Wollensky's on the night of the incident.  The two sides offer sharply differing characterizations of the events that led up to the incident, and what exactly happened during the incident.  With very little objective evidence in the record to substantiate one side's story over the other, resolving these disputes will depend in large part on the credibility of the witnesses.  Thus, this question is one for the jury, and cannot be resolved on summary judgment.  *Jeffreys*, 426 F.3d at 553-54.

### 2.     Vicarious Liability Claims Against S&W Operating and Fourth Wall

Plaintiff asserts vicarious liability claims against S&W Operating and Fourth Wall for Defendant Sagendorf's alleged assault and battery of Plaintiff.  Defendants have moved for summary judgment, arguing (1) that S&W Operating is merely the owner of Wollensky's Grill

and does not "employ" Sagendorf for purposes of vicarious liability, and (2) that Fourth Wall, though admittedly Sagendorf's employer, cannot be held liable for any tortious actions taken by Sagendorf because he was acting outside the scope of his employment.

### a.     Applicable Law

"It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) ("An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment.")).  Under New York law, "an employer may be vicariously liable for an intentional tort committed by an employee if the employee was acting within the scope of employment at the time the tort was committed." *Dean v. City of Buffalo*, 579 F. Supp. 2d 391, 410-411 (W.D.N.Y. 2008) (citing *inter alia Riviello v. Waldron*, 47 N.Y.2d 297, 418 N.Y.S.2d 300, 391 N.E.2d 1278, 1281 (1979)); *see also Adams v. New York City Transit Auth.*, 88 N.Y.2d 116, 643 N.Y.S.2d 511, 666 N.E.2d 216, 218 (1996) ("[A]s a general rule, employers are held vicariously liable for their employees' torts only to the extent that the underlying acts were within the scope of employment.").  There can be no vicarious liability where the employee or agent committed the tort "solely for personal motives unrelated to the furtherance of the employer's business." *Dean*, 579 F. Supp. 2d at 410-11 (quoting *Vega v. Northland Mktg. Corp.*, 289 A.D.2d 565, 566, 735 N.Y.S.2d 213, 214 (2d Dep't 2001)) (internal quotation marks omitted); *see also Vega v. Fox*, 457 F. Supp. 2d 172, 184 (S.D.N.Y. 2006) (holding that courts should look to whether "employee was engaged in the furtherance of the employer's enterprise at

the time of the employee's wrongdoing, and the employer was or could have been exercising

some control over the employee's activities" (quoting *Longin v. Kelly*, 8275 F. Supp. 196, 201-

02 (S.D.N.Y. 1995)).  In considering whether a particular act falls within an employee's scope of

employment, New York courts look to five factors:

> [1] the connection between the time, place and occasion for the act,
> [2] the history of the relationship between employer and employee
> as spelled out in actual practice, [3] whether the act is one
> commonly done by such an employee, [4] the extent of departure
> from normal methods of performance; [5] and whether the specific
> act was one that the employer could reasonably have anticipated.

*Haybeck v. Prodigy Services Co.*, 944 F. Supp. 326, 329 (S.D.N.Y. 1996) (quoting *Riviello*, 47

N.Y.2d 297, 418 N.Y.S.2d 300, 391 N.E.2d at 1281).  New York courts "generally place greater

emphasis" on the last factor.  *Adorno v. Corr. Services Corp.*, 312 F. Supp. 2d 505, 517

(S.D.N.Y. 2004).  In determining whether one is an employee (whose acts can be the basis for

vicarious liability) or an independent contractor (whose acts cannot), the critical factor is the

degree of the employer's "[c]ontrol of the method and means by which the work is to be done."

*Gitchell v. Corby*, 64 A.D.3d 1163, 881 N.Y.S.2d 783, 785 (2009) (quoting *Gfeller v. Russo*, 45

A.D.3d 1301, 846 N.Y.S.2d 501, 502 (4th Dep't 2007)) (internal quotation marks omitted).

### b.      Application of Law to Facts

There is a genuine issue of fact as to whether Sagendorf was acting within the scope of

his duties in allegedly assaulting and battering Plaintiff.  The Private Defendants contend that

Sagendorf could not have been acting within the scope of his employment by touching Plaintiff

in any way, as Sagendorf was employed only "as a manager, not as a bouncer or security guard."

(Private Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Dkt.

No. 96, ("Private Defs. Mem.) at 12-13; *see also* Mulcahy Aff., Ex. L, Dkt. No. 96, ("Hart

Affidavit") ¶ 8.)  But there can be little doubt that Sagendorf approached Plaintiff in his capacity

as manager of Wollensky's to escort her out of the bar, and that such actions are ones that the

employer of the manager of a bar should reasonably anticipate.  Plaintiff points out that

Sagendorf testified in his deposition that he had to deal with unruly customers from time to time.

(*See* Sagendorf Dep. at 13, 14, 21.)  The New York Court of Appeals has specifically held that

the assault of an unruly patron by a bartender to protect his employer's property and to maintain

order on the premises was within the scope of his employment.  *Sims v. Bergamo,* 3 N.Y.2d 531,

169 N.Y.S.2d 449, 147 N.E.2d 1, 2-3 (1957).  Whether Sagendorf's actions at some point

crossed the line beyond the boundaries of his employment duties is not a fact that can be

resolved as a matter of law on this record.

Disputes of fact also preclude summary judgment on the vicarious liability of S&W

Operating.  Although Sagendorf was not employed by S&W Operating, it is well settled that

"[v]icarious liability may be based on proof of an agency relationship."  *Teer v. Queens-Long

Island Med. Grp., P.C.*, 303 A.D.2d 488, 755 N.Y.S.2d 430, 432 (2d Dep't 2003).  Drawing

inferences in the non-moving party's favor, as the Court must, it is reasonable to infer from the

evidence in the record that S&W Operating did have a significant degree of control over how its

agent, Fourth Wall, managed the restaurants that it owned.  Accordingly, the Court cannot

conclude as a matter of law that S&W Operating is not liable for the actions of the employees of

Wollensky's.

### C.    Malicious Prosecution Claim

Plaintiff asserts a malicious prosecution claim against Defendants Sagendorf, Ford, S&W Operating, and Fourth Wall Restaurants.  The Private Defendants move for summary judgment on this claim.

### 1.    Applicable Law

As stated above, in order to bring a malicious prosecution claim, a plaintiff must prove, *inter alia*, that the defendant "initiated" a prosecution against the plaintiff.  *Rohman*, 215 F.3d at 215.  In this context, "initiation" is a term of art.  *Id.* at 217.  As New York courts have recognized, it is well settled that "a civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution."  *Dikler v. City of New York*, No. 07 Civ. 5984, 2009 WL 1562846, at *2 (S.D.N.Y. May 26, 2009) (quoting *Du Chateau v. Metro-North Commuter R.R. Co.*, 253 A.D.2d 128, 688 N.Y.S.2d 12, 15 (1st Dep't 1999)).  A plaintiff may defeat the "presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding," by showing that "the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  *Espada v. Schneider*, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007) (citation omitted).  New York courts have explained that "[t]he defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition."  *Mesiti v. Wegman*, 307 A.D.2d 339, 340, 763 N.Y.S.2d 67, 69 (2d Dep't 2003) (citation and quotation

marks omitted); *see also Maskantz v. Hayes*, 39 A.D.3d 211, 832 N.Y.S.2d 566, 569 (1st Dep't 2007) ("A malicious prosecution defendant must do more than merely report a crime to police and cooperate in its prosecution . . . .").

### 2.   Application of Law to Facts

It is undisputed that Ford's involvement with the authorities consisted of calling 911 to report that Plaintiff had thrown a water pitcher and answering the police officers' questions when they arrived.  Ford did not go to the police station, district attorney's office, or to court and did not affirmatively induce any officer or prosecutor to act to the point that the officer was not acting of his or her own volition.  Though Sagendorf reported his version of the events to the police and signed a deposition supporting the Criminal Court complaint against Plaintiff, this also falls short of "showing active, officious and undue zeal, to the point where the officer is not acting of his own volition."  *Mesiti*, 307 A.D.2d 339, 763 N.Y.S.2d at 69.  There is no evidence that Defendants S&W Operating and Fourth Wall took part in any aspect of initating the prosecution against Plaintiff beyond the fact that Fourth Wall employees called 911 and made reports to the police.  Accordingly, because Plaintiff has not established a genuine issue as to any of the Private Defendants' having "initiated" a prosecution against her, summary judgment is granted to the Private Defendants on Plaintiff's malicious prosecution claim.

### D.   Negligent Retention

Finally, Plaintiff brings a negligent retention claim against S&W Operating and Fourth Wall for the alleged negligent retention of Aaron Sagendorf as an employee.

### 1.      Applicable Law

To maintain a claim of negligent retention, "in addition to the standard elements of negligence," a plaintiff must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 354 N.Y.S.2d 791, 793 (2d Dep't 1997)) (internal citations omitted).  For example, in *Ehrens*, the Defendant asserted that it was "unaware that [the employee] had ever engaged in, or been accused of engaging in" the type of conduct which caused the injury—sexual misconduct.  *Id.*  The Second Circuit found that the district court had properly awarded summary judgment when the plaintiff "failed to counter [the defendant's] assertion with admissible evidence from which a reasonable juror could infer that the defendants, at any time prior to the relevant incident, knew or should have known of [the employee's] propensity to assault minors or otherwise to engage in inappropriate sexual conduct."  *Id.*

### 2.      Application of Law to Facts

In the complaint, Plaintiff alleges that S&W Operating and Fourth Wall had notice of Sagendorf's alleged propensity to violence because Sagendorf (1) had a "propensity for aggressive conduct towards patrons"; (2) had a "tendency to act violently towards patrons"; and (3) had "acted violently towards patrons on prior occasions."  (Compl. ¶¶ 231-33.)  However, Plaintiff has failed to adduce any evidence to support this claim.  Plaintiff asserts that Sagendorf

had acted inappropriately toward her on a previous occasion, but Plaintiff does not contend that the incident was a violent one in any traditional sense.  (Mulcahy Aff., Ex. M ("Sachs Dep. II"), at 277-78 (stating that Sagendorf once rubbed against her breasts inappropriately and "tried to make it look like it was an accident").)  To the contrary, Plaintiff was asked in her deposition whether she could tell of "any violent acts towards patrons that she knows of" that were committed by Sagendorf.  She replied, "No, I can't. . . . No, I can't do that at this time, no." (Sachs Dep. II at 290.)

Defendants, for their part, put in evidence that they were not, and are not, aware of any violent incidents involving Sagendorf.  Thomas Hart, the general manager of both Wollensky's and Smith & Wollensky's Restaurant for 27 years, averred that "Sagendorf has never been disciplined or reprimanded for any sort of violent, aggressive, anti-social or other inappropriate behavior toward patrons or anyone else while on the job."  (Hart Affidavit ¶ 9.)  Sagendorf, in his affidavit, confirms this.  (Mulcahy Aff., Ex. D ¶ 10.)

Because Plaintiff has failed to show any genuine dispute that Defendants knew or should have known of Sagendorf's propensity to engage in violent conduct, Plaintiff's negligent retention claim fails.  The Court thus grants summary judgment to the Private Defendants on this claim.

**VI.    Conclusion**

For the foregoing reasons, Plaintiff's motion for spoliation sanctions is DENIED.

The Court dismisses the John Doe Defendants #1-4 from the case, as they were not identified before the close of discovery.

The City Defendants' motion for summary judgment on Plaintiff's state law and § 1983 claims of false arrest, malicious prosecution, and excessive use of force in handcuffing Plaintiff is GRANTED.  The City Defendants' motion for summary judgment on Plaintiff's *Monell* claim is GRANTED.  The City Defendants' motion for summary judgment on Plaintiff's claims that Defendant Musa used excessive force in effecting her arrest is DENIED.

The Private Defendants' motion for summary judgment on Plaintiff's malicious prosecution and negligent retention claims is GRANTED.  The Private Defendants' motion for summary judgment on Plaintiff's assault and battery claims against Sagendorf, S&W Operating, and Fourth Wall is DENIED.

The Clerk of Court is directed to close the motions at docket numbers 77, 88 and 94.

SO ORDERED.

Dated: New York, New York
      September 4, 2012

_____
J. PAUL OETKEN
United States District Judge

42